FRED C. AUFDERHEIDE ET AL. v. POLAR WAVE ICE & FUEL COMPANY, Appellant.—4 S. W. (2d) 776.

Court en Banc, March 17, 1928.

*Foristel, Mudd, Hezel & Habenicht, James T. Blair* and *Frank X. Hiemenz* for appellant.

342

*Glendy B. Arnold* for respondents.

*Foristel, Mudd, Hezel & Habenicht, James T. Blair* and *Frank X. Hiemenz* for appellant in reply.

SEDDON, C.—This is a suit in equity, wherein plaintiffs (respondents) seek to perpetually enjoin an alleged potential, prospective, or anticipated, nuisance. The plaintiffs are four in number, and own, and reside in or upon, certain residential properties on Penrose Street and Obear Avenue, facing, or fronting upon, City Block No. 2485 in the city of St. Louis, which city block is bounded on the east by Grand Avenue, on the south by Penrose Street, on the west by Obear Avenue, and on the north by Carter Avenue. It is alleged in the bill, or petition, that ''these plaintiffs (four in number) bring this suit not only in their own behalf, but at the request and on behalf of thirty-seven other residents and property owners in said neighborhood, too numerous to be joined as plaintiffs herein, who

are threatened with similar irreparable injury and damage, and have the same causes of complaint as plaintiffs herein.'' One of the plaintiffs testified that the four plaintiffs of record had brought the suit on behalf of a syndicate of individual property owners in the neighborhood, some forty-two or forty-three in number. The defendant (appellant) is a corporation engaged in the business of manufacturing and distributing ice in wholesale and retail quantities.

The petition does not allege the present existence of a nuisance or seek to abate such an existing nuisance, but, on the other hand, seeks to perpetually enjoin the defendant from commencing or completing the erection, construction and operation of a plant and building upon defendant's real property located in the southwest corner of said City Block No. 2485, being the northeast corner of Obear Avenue and Penrose Street. The petition alleges, in substance, as grounds for the purely equitable relief sought, that defendant has acquired a lot of ground on the southwest corner of said City Block No. 2485, ''not more than sixty feet distant from said residences of these plaintiffs, and is now proceeding to erect and construct thereon a large brick building to be used by it for the purpose of manufacturing, storing and selling ice therein and therefrom; . . . that defendant intends to use the remainder of said lot for the erection of stables, garages, wood sheds and coal bins, to house its motor trucks, ice and coal wagons, mules and horses, to be used in said business, and for the storage therein of wood and coal, to be bought and sold by it;'' that the successful manufacture of ice in said plant ''will necessarily require its operation during all hours of the night and defendant intends to so operate the same; that the sale of ice therefrom cannot be successfully carried on except in the late hours of the night and the early hours of the morning, and the defendant intends to so conduct said business; that the maintenance and operation of said plant will daily, and especially during the late hours of the night and early hours of the morning, bring to and around said premises, and into said neighborhood, large numbers of noisy motor trucks and animal-drawn wagons, and large numbers of boisterous and noisy ice and fuel vendors, peddlers, teamsters and chauffeurs, by reason of which there will be created in and around said premises, during said hours, loud and disturbing noises and disorder, and loud, profane and vulgar language, which will be heard throughout said neighborhood; that in the manufacture of ice in said plant, large quantities of ammonia will necessarily be used, from which fumes and vapors will escape into the air and diffuse themselves through the neighborhood, greatly injuring and destroying the vegetation growing upon the premises of plaintiffs and along the sidewalks of said neighborhood;'' that the process of manufacture of ice which defendant has planned and intends to use in said plant contemplates the

construction of a cooling system on or near the top of said building, and from thirty-five to fifty feet above the street, which will consist of "a large number of coils of iron pipe two or three inches in diameter, the length and number of which are unknown to plaintiffs, over which a constant flow of water will be maintained day and night that will fall through the open air, some ten or twenty feet, to a receptacle beneath; that said cooling system will be so constructed as to be exposed to the wind from at least three cardinal points of the compass, and as said water flows over said coils and breaks into small particles, a slight wind will cause it to form into mists and to be carried from said plant onto the premises of the plaintiffs, injuring their property and impairing their use and enjoyment thereof; that, in making ice in the manner planned by defendant, a large number of metal containers of varying sizes will be used, in which water will be frozen, and which must be emptied every night in order to remove the ice therefrom, and, in handling said metal containers, in the early hours of the morning, it will be impossible to do so without making great and loud noises, which will be heard throughout the neighborhood; that the maintenance of horses and mules on said premises, necessary in conducting said business, will necessarily produce large quantities of manure and refuse matter, drawing flies and emitting unhealthful and annoying odors in said neighborhood; that the loading and unloading of large quantities of coal, fire wood and kindling on said premises and the bringing thereto of large numbers of motor trucks, ice and coal wagons will create on and around said premises large quantities of dirt, dust and gasoline fumes, which will be scattered over the neighborhood and into the houses and on the premises of these plaintiffs; that heavy machinery is intended to and will be necessary, in manufacturing ice in said plant, and the operation of said machinery will be constant throughout the day and night, and will, by reason thereof, make continuous and disturbing noises during the usual hours of rest;" that the erection, maintenance and operation of said plant, as aforesaid, will, in law and fact, constitute a nuisance to plaintiffs, their families and other adjacent property owners and residents, in that "(a) the character of the structure and plant, and the nature of the business carried on therein and thereat, in a residential neighborhood, as alleged herein, will greatly and unreasonably destroy and depreciate the market value of the property of these plaintiffs; (b) the noises, odors, mists, dust and dirt, emanating from the operation of said plant and created thereby, as aforesaid, will be so great as to unusually disturb the comfort and quietude of plaintiffs and the members of their households, and to render their homes uninhabitable with any reasonable degree of comfort and peace, and will so greatly disturb the sleep and rest of the plaintiffs, and the members of their

households, as to force them to abandon their homes, or become ill and sick therefrom, thereby inflicting upon plaintiffs and their property great and irreparable injury and damage.'' The answer of defendant is a general denial.

Evidence was adduced by the respective parties as to the uses and character of the City Block No. 2485 and the surrounding, or contiguous, territory and neighborhood. The dimensions of the city block are approximately 513 feet from north to south and approximately 315 feet from east to west. As hereinbefore stated, the block is bounded on the east by Grand Avenue, on the south by Penrose Street, on the west by Obear Avenue, and on the north by Carter Avenue. The north 150 feet, approximately, of the block is owned by a planing mill company, upon which has been operated, for twenty-five years or longer, a large planing mill, with a lumber yard, abutting on the south side of Carter Avenue. The planing mill and lumber yard were located and operated prior to the times plaintiffs acquired their respective residential properties. The south 363 feet of the block is owned by the defendant. Prior to defendant's ownership of the south part of the block, that portion of the block had been used and occupied by an airdome, or outdoor moving picture theatre. The south part of the block, abutting on the north side of Penrose Street, was originally a deep hole or hollow, thirty feet in depth, but had been used as a public ''dump'' and was gradually filled in with cans, ashes and other debris. The northeast corner of Grand and Carter avenues, diagonally across the intersection from the lumber yard, is an abandoned quarry, which has long been used as a public ''dump'' and has likewise been filled in with dumpings and debris. A gasoline and oil station appears now to occupy a portion of this corner. The southwest corner of Obear and Carter avenues is occupied by a furnace and tin shop, the front end of the ground floor being used as a display room, and the rear end being used as an assembling plant, with residential or living quarters on the second floor. On the southwest corner of Obear Avenue and Penrose Street (diagonally across the intersection from defendant's plant site) is a building formerly occupied by a saloon, but now used, perforce of the Volstead law, as a ''soft drink parlor.'' At the southeast corner of Obear Avenue and Penrose Street, immediately across Penrose Street from defendant's plant site, the plaintiff Aufderheide maintains, and has so used and maintained for many years, a material yard, which he described in his testimony thus: ''I have a lot 59 by 103, which they call a junk yard, which is a material yard. I take contracts to alter buildings and get material what we cannot use and put in new material and take the old building material to this yard, and at times use in different yards, and sometimes they lay there for a while and dirt accumulates on it, but they are not decayed, but they are service-

able lumber and things to use, and *I pay taxes for that thing and I am entitled to use it as a lumber yard or anything I prefer;* not lumber yard, but contract material yard.'' In the block immediately south of Aufderheide's material yard, on the east side of Obear Avenue, extending the length of the block between Lee and Kossuth avenues, is a large open car barn, used by the street railway company as a storage lot for street cars. Approximately two or three blocks south of defendant's plant site is a public city park, known as Fair Ground Park. With the exception of the furnace and tin shop aforementioned, the lots abutting on the west side of Obear Avenue, between Carter Avenue and Penrose Street, are either vacant and unimproved or used for residential purposes. The property of plaintiff Aufderheide occupies approximately the west half of the block on the south side of Penrose Street, between Obear and Grand avenues, and, except the material yard aforementioned, is improved with three two-story brick flat buildings, with a one-story frame garage building extending between two of the flat buildings. It is fair to plaintiffs to say that photographs of their respective residential properties in evidence indicate that their properties are modest, but nevertheless substantial and attractive, residential properties. The evidence tends to show that the properties from two to several blocks distant from City Block No. 2485 are vacant lots or are occupied by small stores, single family residences, flats and apartments, but that such properties are predominantly residential in their uses. There is no evidence that City Block 2485, or any part thereof, has ever been used for residential purposes, or for any use or purpose other than commercial or industrial. Neither is there any evidence in the record that City Block No. 2485, or any of the contiguous and surrounding tracts of land, have been restricted, by the acts of present or prior owners, as to use or occupancy; in other words, there is no evidence herein that any of the properties aforementioned are burdened with restrictive covenants, running with the land, as to use or occupancy. Penrose Street is approximately fifty feet wide and Obear Avenue is approximately sixty feet wide. So much for the *locus in quo.*

Necessarily, since plaintiffs were seeking to prove and establish that an ice plant not yet in existence will be a nuisance at some future time, their evidence consisted largely of testimony of witnesses respecting conditions (similar to those conditions which it is alleged in the petition will follow or result from the erection and operation of defendant's plant) incident to, and attendant upon, the operation of other existing ice plants in the city of St. Louis. Defendant offered the testimony of witnesses to the contrary. Suffice it to say that there was much testimony, *pro* and *con*, respecting conditions attendant upon, and incident to, the operation of existing ice plants, and whether their operation constituted, or did not constitute, a nuisance.

Such testimony, in our judgment, after a careful study and analysis of a rather voluminous printed record, was evenly balanced and preponderated in favor of neither of the opposite parties to this action. Some of the existing plants, referred to in such testimony, are owned and operated by defendant, while others are owned and operated by parties foreign to this action. The method of operation of the existing plants seems to have varied widely, that is, some of the existing plants are operated by steam power and the use of coal and smoke-producing fuels, while others are operated by electrical power and from electrical current obtained from public utilities, separate and apart from the ice plants. Likewise, the ice-making machinery and appliances in use in existing plants are widely different, and (so far as the record discloses) none of the existing plants is equipped with the modern machinery and appliances which defendant purposes to install and use, in the manufacture and distribution of ice, in the plant in controversy in the instant action.

Defendant's evidence tended to show that it purposes to erect, upon its land in the south part of City Block No. 2485, a modern brick and concrete ice-manufacturing plant equipped with the latest and most improved ice-making machinery and equipment. The plans for such plant were put in evidence and explained in detail by defendant's architect, who was called as a witness by plaintiffs. The nature and operation of the modern machinery and equipment purposed to be used in said plant, and contracted for by defendant, were likewise explained in detail by an officer and representative of the machinery and equipment company. It appears from the record that the contemplated building is to be erected (and has, since the trial of this action, apparently been erected and put into operation) in the southwest corner of defendant's tract of land. The building is to be, and apparently has been, erected to the lot lines, or inner sidewalk edges, of Penrose Street and Obear Avenue. The building extends east 122 feet on Penrose Street and north 210 feet on Obear Avenue. The extreme height of the building is thirty-nine feet above the street grades. The rear or north part of the building, occupying more than one-half of the floor area of the building, is to be used for the storage of ice. It has a capacity of 10,000 tons of ice. On the front of the building, or Penrose Street side, are an engine room, a brine-tank room, and a shipping room for delivery of ice, extending east on Penrose Street in the order named from Obear Avenue. East of and adjoining the shipping room is a loading dock or platform, with a private entrance or roadway leading thereto from Penrose Street for the accommodation of delivery vehicles. The private entrance for vehicles is on Penrose Street, approximately 151 feet east of Obear Avenue, about midway between Obear and Grand avenues. The loading platform, roadway and entrance thereto

are wholly on defendant's property and, according to the plans in evidence, are fenced off from Penrose Street by a solid brick wall, approximately twenty feet high, with the exception of a gateway or entry from Penrose Street into the private roadway. It is purposed to pave the private roadway with granite paving blocks laid on a cement and sand cushion, and then grouted with asphalt, as a cushion and sound deadener, in order to effect a noiseless pavement. The plans in evidence indicate that the exterior of the building bears an attractive architectural appearance, or at least as attractive an appearance as a manufacturing plant may bear.

In order the better to comprehend and understand the machinery and equipment contemplated to be used in the defendant's plant, and its operation in the manufacture and distribution of ice, it may be well to explain briefly the process of freezing ice to be used in the plant in controversy. Ammonia is used in the freezing process, and enters upon the freezing process in the form of a gas. The gas is subjected to pressure in a machine called a "compressor," which is used to heat the ammonia gas. The gas comes out of the compressor at a relatively high temperature and passes into another machine, called a "condenser," where it is cooled and liquefied. The condensers generally used in ice plants are of two types, viz., the open, or atmospheric, type, and the closed type. The open type of condenser is usually placed on the roof of the plant and water is pumped to the roof and allowed to run over a series of parallel pipes, constituting the condenser. The closed type of condenser is of two kinds, the tube-and-shell and the two-pipe system. The tube-and-shell type is the one purposed to be used in defendant's plant. It is not located upon the roof of the plant, as in the use of the open, or atmospheric, type of condenser, but is located inside the engine-room on the ground floor of defendant's plant. No water flows or falls over the outside of the condenser, but the pipes are contained within a solid steel shell and the water runs through the pipes and thereby cools the ammonia gas, which is confined within the solid steel shell. In the process of cooling the heated ammonia gas in the condenser, the water used for such purpose becomes warm and must be recooled. This is done by means of a cooling system, which is to be located upon the roof of defendant's plant. The cooling of the water is effected by means of revolving nozzles, or devises, which, by centrifugal force, spray the water horizontally into the air, from whence it falls into a spray pond beneath, and thence is conducted again to the condenser, where the process of liquefying the ammonia gas is repeated. After the heated ammonia gas is cooled and liquefied in the condenser, the liquid ammonia is conducted by means of pipes into and through the brine tank, where it absorbs the heat and thereby cools the brine in the tank, resulting in the freezing of the water which is enclosed in tanks submerged in the brine. The water is placed in closed tanks or receptacles, approximately

10x20x44 inches in dimensions, which are immersed or submerged in the brine tank. The freezing process requires about 36 to 48 hours, when the water in the tanks is frozen into 300 pound blocks of ice. The tanks or cans are then lifted from the brine tank by means of an overhead automatic crane or hoist, dipped in a tank of warm water to loosen the ice from the can, and then the cans, by means of a mechanical devise, are slowly turned upon a tipping table, allowing the ice to slip from the cans onto an incline and thence into the shipping room or into the storage room. The machinery above described may be operated by steam or electricity. The testimony tends to show that the modern ice plants are electrically operated, and the plant in question is to be so operated, according to defendant's testimony.

Defendant's evidence tends to show that the roof of the Penrose Street side of the plant in controversy is twenty-five feet above the street; that the spraying nozzles, constituting the cooling system above described, stand forty-two inches higher than the roof; that the water is thrown horizontally from the rotating spraying nozzles and rises only two or three inches above the height of the nozzles; that the roof is enclosed on the four sides thereof by walls, extending fourteen feet above the level of the roof and ten or eleven feet above the extreme top of the sprays of water. The north wall of the roof is the south wall of the storage house, and is a blank wall fourteen feet higher than the roof of the front, or Penrose Street side, of the building. The east, south and west walls of the roof are brick parapet walls fourteen feet in height. Louvers, so-called, are built into these parapet walls to admit the air, but the louvers are set at an angle so as to confine the spray or moisture within the four walls of the roof. These louvers are constructed of overlapping planks, set close together, seven-eighths of an inch in thickness and six to eight inches wide. The louvers are faced on the outside, or exterior, of the parapet walls with a latticed terra cotta grill, and the brick parapet walls are solidly extended above the louvers a distance of approximately four feet. The function of the louvers, as explained by defendant's mechanical engineer, is ''to hold the drift or the spray and confine it onto the roof. Spray hits that side and hits this side; it is deflected to here; it is deflected to there; it is deflected to here (indicating). Five times it is broken. The theory of this is the mechanical scheme used in all vessels where the separation of moisture and gas is required. The breaking up of the current is what separates our water. You can hold your handkerchief there and you don't get any moisture.'' In other words, defendant's evidence tends to prove that there is no possibility of spray or mist being blown by the wind from the roof of the plant onto the sidewalks and contiguous properties below. The cooling system above described,

and contemplated to be used in defendant's plant, is in use in no existing plant in St. Louis and is believed by the defendant's witnesses to be an improvement over existing systems of cooling and to absolutely and certainly prevent the escape of the spray or mist from the roof of defendant's plant.

Defendant's evidence tends to show that the closed tube-and-shell type of condenser to be used in its plant will not permit the escape of ammonia gas or fumes and that, even if the gas should come in contact with the water in the condenser, no fumes will escape, because water has a 700 to 1 volume affinity for ammonia, and the presence of ammonia in water can only be detected by the use of litmus paper or Nesler's solution, and not by the sense of smell.

Plaintiff's evidence tended to show that there is considerable noise occasioned by the handling and dumping of the cans of ice in existing plants. It was shown by defendant's evidence that an improved method of handling and dumping the cans will be used in the plant in controversy. By the improved "group method," so-called, the cans will be submerged in the brine tank in series or groups of eight cans. The eight cans are riveted onto an iron frame, or "basket," so called, so that the cans do not come in contact and "bang" together when emptied of their contents on the tipping table. They are handled by an electrical crane and raised and lowered by an automatic system of gears, which are enclosed by oil-tight housing in a bath of oil (somewhat like that of an automobile lubricating system), thereby rendering the operation of the gears noiseless. The improved system just described is in use in no existing plant in St. Louis.

Defendant's testimony was to the effect that no stables, garages, coal or fuel bins, are to be maintained or used in the plant in controversy, and the plans for the plant provide for no such accessories. No horses or mules will be stabled on the premises, according to defendant's evidence. Testimony was introduced by plaintiffs to the effect that there is considerable noise and confusion, loud, boisterous and profane talk among drivers of vehicles, and obstruction of streets and passageways, incident to the sale and loading of ice at the existing ice plants in St. Louis; that such annoyances occur in the early hours of the morning and disturb the slumber, quietude, peace and comfort of residents of the neighborhoods surrounding the existing plants. Defendant, on the other hand, introduced testimony of witnesses, residing near by existing plants, to the effect that they are not disturbed or annoyed by the loading of ice upon vehicles at the existing plants. According to defendant's evidence, the loading platforms at its existing plants are not opened to vendors of ice until five or six o'clock in the morning, and its platform or dock foremen see that order is maintained among the teamsters and ped-

354

dlers of ice and that confusion in loading of vehicles is avoided. There was some testimony that the "hum" of the electrical machinery is audible outside of some of the existing plants, but that such "humming" noises may be largely, if not entirely, eliminated by closing the windows of the engine-room. Defendant's evidence was to effect that the "hum" is no more than that of any running motor, which cannot be entirely eliminated, but is not sufficient to prevent the carrying on of a conversation, in moderate and ordinary tones, inside of the engine-room.

Upon the evidence above detailed, the trial chancellor, on July 21, 1924, entered a decree and judgment in favor of plaintiffs and to the effect that defendant, its officers, agents and servants, "be and are hereby forever and perpetually restrained, prohibited and enjoined from commencing to construct, to erect or to build, or from completing or finishing the erection, construction or building, or from doing any act which tends, directly or indirectly, to complete or finish the construction, erection or building, on the aforesaid lot and block, of any house, building or other structure, or the erection, placing or installation therein or thereon of any machinery or other fixtures or equipment designed or intended to be used for the manufacture, storage, distribution or sale of ice therein or therefrom, and from operating or causing to be operated any ice manufacturing plant on said lot and block, and from selling or distributing ice from any ice manufacturing or storage plant located on said lot and block, or from doing any other act or acts in violation of the letter and spirit of this decree." The decree was subsequently amended so as to "permit defendant to complete the erection of the walls, roofs and structure beams, columns and other supports thereof, in order to make said building safe and to avoid damage and deterioration thereto and to the machinery now in said building from the elements; and that in all other respects said decree remain in full force and effect."

Timely motions for new trial and in arrest of judgment were filed by defendant and overruled by the trial court. On September 5, 1924, defendant filed herein, and presented to the then Chief Justice of this court, for his inspection, a copy of the record herein, together with an affidavit and application for an appeal to this court, pursuant to Section 1474, Revised Statutes 1919. On September 8, 1924, it appearing to the Chief Justice of this court that material error was committed by the trial court against the defendant herein, this court made and entered an order granting defendant an appeal to this court, and ordering defendant to file in the circuit court an appeal, or *supersedeas,* bond in the sum of $25,000, which bond was timely filed by defendant and approved by the trial court, as ordered by this court. Timely notice of appeal was served upon, and ac-

cepted by respondents (plaintiffs), in accordance with Section 1477, Revised Statutes 1919. Such is the record before us.

I. As a preface to this opinion, we pause to remark that this appeal does not involve the applicability, construction, validity, or constitutionality of any zoning ordinance (so called) of the city of St. Louis. The purposed location of defendant's ice plant upon the lot of land now in controversy was before this court en banc, in an earlier proceeding. [State ex rel. v. McKelvey. 301 Mo. 1.] That was an original proceeding in mandamus, brought in this court, to require the Building Commissioner of the City of St. Louis to issue to the relators therein a permit for the erection of the ice manufactory now in controversy. The proceeding turned upon the constitutionality of the then applicable and existing zoning ordinance of that city, which zoned the territory in which the lot in question is situated as a "second residence district," the lands within which district were limited and restricted by the ordinance to uses other than commercial and industrial. A majority of the then membership of this court ruled the zoning ordinance of the city of St. Louis therein involved to be violative of our State Constitution, and therefore invalid and ineffective. The effect of our ruling and judgment in that proceeding was to relieve the lot now in controversy from restrictions as to its use imposed by the zoning ordinance therein ruled to be unconstitutional and invalid. Our ruling in the McKelvey case, supra, therefore became a rule of property, and so the rule of *stare decisis* applies, at least so far as the use of the lot now in controversy, as affected by that zoning ordinance, is concerned. Relying upon our ruling and judgment in the McKelvey case, the defendant herein had the undoubted right to the issuance of a permit by the municipal officers of the city of St. Louis for the erection of the ice manufacturing plant now in controversy upon the lot or tract of land defendant now owns in City Block No. 2485, and presumably the officers of the city have issued such permit. In other words, under our judgment and ruling in the McKelvey case, the zoning ordinance there in question (and ruled to be void and ineffective) no longer is applicable to the lot in controversy and imposes no restriction upon its use for commercial or industrial purposes. It therefore matters not (in this case) what the views of the present membership of this court may be (or what views the writer of this opinion may entertain) respecting the constitutionality and applicability of similar subsequent or existing zoning ordinances of the city of St. Louis, or what expression we may have given to our views on the subject in any case ruled subsequently to the McKelvey case, for no zoning ordinance is directly, or even indirectly, involved in the instant case as a ground of the injunctive, and purely

equitable, relief sought herein. As we said in the beginning, this action is one brought to enjoin an alleged potential or anticipated nuisance, and no existing zoning ordinance of the city of St. Louis has anything to do with the single question presented by the record before us on this appeal, namely, whether the contemplated ice plant of defendant will, or will not, necessarily and inevitably become a nuisance.

II. We are confronted at the threshold of this matter with the contention of respondents (plaintiffs) that this court is without jurisdiction of this appeal in that the record fails to disclose that the pecuniary value of the relief granted to the plaintiffs herein, and of the loss to defendant, if the decree *nisi* be affirmed, exceeds $7500, exclusive of costs; furthermore, that, inasmuch as the appeal herein was granted and allowed by this court, as provided in Section 1474, Revised Statutes 1919, rather than by the trial court, therefore, if this court is without jurisdiction of the appeal, the cause cannot be transferred by this court to the proper Court of Appeals, but the appeal granted by this court must be dismissed, under the ruling of Division Two of this court announced in State v. Hartman, 282 Mo. 680. Hence, we must give attention to the jurisdictional point raised by respondents.

It has been held by this court, in determining our appellate jurisdiction in actions seeking purely injunctive relief, or wherein relief other than a money judgment is sought, that ''the amount involved must be determined by the value in money of the relief to the plaintiff, or of the loss to the defendant, should the relief be granted, or *vice versa*, should the relief be denied.'' [Gast Bank Note & Lithograph Co. v. Fennimore Assn., 147 Mo. 557; Kitchell v. Railway Co., 146 Mo. 455; Gary Realty Co. v. Kelly, 284 Mo. 418; Cambest v. Hydro Electric Co., 292 Mo. 570; Handlan v. Stifel, 219 S. W. 616; State ex rel. v. Mid-State Serum Co., 264 S. W. 878.] In the cited cases, however, there was nothing upon the record before us whereby we could approximate the pecuniary value of the equitable relief sought by plaintiffs, or the pecuniary loss to the defendants, should the equitable relief be granted; in other words, our conjecture upon the pecuniary amount in dispute, so far as disclosed by the record in the cited cases, might have been equally well grounded that the pecuniary amount in dispute was less than our pecuniary jurisdiction as that it was within our pecuniary jurisdiction. Not so, however, in the instant case.

It appears from the record before us that the four nominal plaintiffs herein ''bring this suit not only, in their own behalf, but at the request and on behalf of thirty-seven other residents and property owners in said neighborhood, and as representatives of a class of

other residents and property owners in said neighborhood, too numerous to be joined as plaintiffs herein, who are threatened with similar irreparable injury and damage, and have the same causes of complaint as plaintiffs herein.'' One of the nominal plaintiffs testified that the nominal plaintiffs are acting for and on behalf of some forty-one or forty-two individual property owners. It is charged and alleged in plaintiffs' bill that defendant's structure and plant, and the nature of business carried on therein, ''will greatly and unreasonably destroy and depreciate the market value of the property of these plaintiffs'' (i. e., the property of the four nominal plaintiffs and of the thirty-seven other property owners whom they represent and on whose behalf the action is maintained). Evidence was adduced by plaintiffs that an ice plant in a residential neighborhood will substantially decrease property values; that ''property values would be adversely or detrimentally affected for residence purposes in the vicinity of the proposed plant;'' and that values of residence properties in the neighborhood ''would be considerably depreciated.'' Photographs of the residential properties of the several nominal plaintiffs are in evidence and shown in the record, upon which we can base a reasonable conclusion as to the cost and value of such structures and improvements.

Besides, the respondents (plaintiffs) filed of record in this court a motion to advance the cause upon our docket. Adverting to that motion, we find stated therein by respondents, as ground of the motion: ''The granting of the *supersedeas* in this cause has deprived respondents of all remedy by injunction, under the laws of this State, until this cause is finally determined in this court. Moreover, *it seems quite obvious that the appeal bond,* furnished by appellant, a copy of which is among the files, *is no protection to respondents against damages resulting to them* from the suspension of the decree and appellant's violation thereof pending the settlement of this appeal.'' (Italics ours.) The amount of the appeal bond was fixed by this court at $25,000, and filed in that amount by appellant. Hence, we find in our own records a motion filed by respondents admitting, in substance and effect, that the appeal bond filed by appellant in the sum of $25,000, conditioned that appellant (defendant) will ''pay all *damages* and costs which may be awarded against it'' is ''no protection to respondents against *damages* resulting to them.'' From all of which, the conclusion reasonably and logically may be drawn, we think, that the pecuniary. value of the relief sought by plaintiffs herein, if such relief be denied them, exceeds the amount of the appeal bond filed herein, which amount has been fixed by this court in the sum of $25,000. Again, it is admitted by respondents' motion to advance the cause on our docket that the defendant has constructed and is now maintaining and operating the ice plant in

controversy. Such fact also appears to be conceded by all the parties to this action in their respective briefs filed herein. Plans of the plant in controversy, in evidence, and the testimony of witnesses explaining the size and character of the plant, machinery and equipment, force the reasonable conclusion on our part that the original cost thereof far exceeds the pecuniary jurisdiction of this court, and that the building structure, by reason of its peculiar and special design, cannot easily or readily be made available for any other use than that of manufacturing ice and storing the same. Likewise, the nature and size of the special machinery and equipment to be installed and used in the defendant's plant, and which, according to the testimony of one of the witnesses, had been delivered at the plant site at the time of the trial (and which has been actually installed and put into use and operation, as apparently conceded by the briefs of the parties herein), leads us to the reasonable conclusion that such machinery and equipment cannot be disassembled, taken down and removed from the plant for any amount of money less than the pecuniary jurisdiction of this court. By reason of experience, if from no other source, we have some accurate knowledge of the present high cost of building and of the manufacture and installation of machinery and equipment. Where the record before us on appeal shows (as we find it does here) that the pecuniary value of the relief to plaintiffs, or of the loss to defendant, should the relief be granted, or *vice versa*, should the relief be denied, exceeds the sum of $7500, exclusive of costs, then we must take jurisdiction of the appeal. We have so ruled in State ex rel. Union Electric Light & Power Co. v. Reynolds, 256 Mo. 710, and Tureman v. Ketterlin, 304 Mo. 221.

That more than $7500 is actually involved in this case, we think conclusively appears from the record as made in the trial court. No one examining that record can arrive at any other conclusion. If, from the whole record, it suffices to show our jurisdiction, then it is our clear and positive duty under the constitutional mandate to pass upon the merits of the appeal. Coupled with the facts as to the amount involved, as disclosed by the record in the trial court, is the admission of respondents, made in their motion, filed in this court, to advance the cause for hearing on our docket, disclosing therein the construction of the respondents themselves upon what the record as made in the trial court discloses respecting the amount involved. While it is true that we have repeatedly ruled, and rightly so, that parties cannot confer jurisdiction upon this court by acquiescence or agreement, nevertheless the admissions made by a *respondent* in this court may be looked to for the purpose of viewing the respondent's construction of what the record before us discloses respecting the amount involved. Such a situation is far different from that wherein

an *appellant*, by an affidavit filed in this court, or in the trial court, after judgment *nisi*, seeks to supply the facts showing the amount involved and necessary to confer jurisdiction of an appeal in this court, although *appellant's* affidavit be not controverted by respondent. Here, the *respondents*, by their motion to advance, place their own construction upon what the record *nisi* discloses respecting the amount involved. Their construction of what the record *nisi* discloses on that question accords with and confirms our own construction of the record *nisi*. The construction given to a record by a party, and the written admissions of a party, we think, are always properly for the consideration of the appellate court when the appellate court itself is passing upon and construing that record. At any rate, we find ample reason, in the record made in the trial court and now before us, to retain jurisdiction of the cause upon this special appeal upon the ground that the pecuniary value of the relief granted to plaintiffs and respondents, or the loss to defendant and appellant (when measured in money), as a result of the judgment, far exceeds the sum of $7500, exclusive of costs. Being convinced of our jurisdiction herein, we proceed to the merits of the appeal.

III. It cannot be doubted or seriously questioned, we think, that the business of manufacturing, storing, selling and distributing ice is a legitimate and lawful business, and, when reasonably and properly conducted, does not constitute a nuisance *per se*. Such seems to be the uniform and undoubted trend of judicial decision and authority. [Goose Creek Ice Co. v. Wood (Tex. Civ. App.), 223 S. W. 324, 327; Flood v. Consumers Co., 105 Ill. App. 559, 563.] Neither can it well be doubted or questioned that such business is a useful and necessary one, wherein the general public is vitally interested and from which they derive immeasurable benefit, for the reason that ice is a useful commodity and one which is well-nigh necessary to the public health and comfort. It preserves the food we eat from decay and putrefaction, it cools and renders palatable the water which we drink, and performs countless other functions necessary and essential to the preservation of the public health and the comfort and well-being of human life and existence. Furthermore, in our large cities and centers of population, such as the great city of St. Louis, it is well-nigh essential that ice manufactories shall be operated in several and separate parts of the city, closely contiguous to residential districts, in order that long hauls and wastage and melting of ice may be avoided, if not entirely eliminated. Such avoidance tends to decrease, or keep uniform and level, the price to the consumer of this necessary and useful commodity; otherwise, the price of the commodity would accordingly have to be fixed in contemplation of the length of the haul and the wastage of the commodity which would

necessarily result from long hauls and consequent delays in delivery to the consumer. While the manufacture of ice and its sale and distribution as a commodity has been recognized by this court as a public necessity, yet it has been ruled that a municipality of the State, by reason of the limitations of our Constitution, cannot use or expend the public funds to engage in such enterprise, but such necessary business must be left largely, if not entirely, to private enterprise. [State ex rel. Kansas City v. Orear, 277 Mo. 503.] We must therefore start with the premise that the manufacture, distribution and sale of ice is a useful, legitimate and lawful business enterprise, and does not constitute a nuisance *per se*, although conceding, of course, that the method and manner of operation of such business enterprise may render it a nuisance, depending upon the circumstances applicable and incident to its operation.

As in other cases, the burden of proof rests upon the plaintiffs (respondents) herein to establish, by the greater weight of the evidence, that the method and manner of operation of defendant's contemplated ice manufactory will necessarily and inevitably result in the precise annoyances which are alleged in the bill or petition herein will follow, or result from, the completion and operation of defendant's plant, and thereby constitute a nuisance. This being an action to enjoin an alleged anticipated or prospective nuisance, as distinguished from an action to abate an existing nuisance, the degree and character of proof required differs from that required in an action to abate an existing nuisance, and must be such as to make clear, certain, and free from all substantial doubt, that the anticipated nuisance certainly and inevitably will result. Such is the uniform rule of evidence and practice laid down by the text-writers on the subject, and amply supported by judicial authority.

Thus, Mr. High in his recognized and meritorious text on Injunctions (4 Ed.) sec. 787, says: "Great caution is exercised in interfering with establishments and erections which tend to promote public convenience, . . . and in such cases it will not suffice to show a probable or contingent injury, but it must be shown to be inevitable and undoubted." And, again, the same text-writer says (Sec. 743): "Where an injunction is asked to restrain the construction of works of such a nature that it is impossible for the court to know, until they are completed and in operation, whether they will or will not constitute a nuisance, the writ will be refused in the first instance."

Joyce on the Law of Nuisances (1906) sec. 102, thus lays down the rule: "The fact that a business which is lawful may become a nuisance after it has been commenced is not a sufficient ground for enjoining the same. It must clearly appear to the satisfaction of the court

that it will become a nuisance. So, it has been said in this connection: 'Before a court of equity will restrain a lawful work from which merely threatened evils are apprehended, the court must be satisfied that the evils anticipated are imminent and certain to occur. An injunction will not issue to prevent supposed or barely possible injuries.'' [Citing Windfall Mfg. Co. v. Patterson, 148 Ind. 414.]

Wood on Nuisances (3 Ed.) sec. 797, says: "Injunctions against *threatened* nuisances will seldom be granted except in extreme cases where the threatened use of property is clearly shown to be such as leaves no doubt of its injurious results. The bill must set forth such a state of facts as leaves no room for doubt upon the question of nuisance, for if there is any doubt upon that point, the benefit of it will be given to the defendant. . . . But the mere fact that the building is to be devoted to a use that has always proved a nuisance elsewhere is by no means conclusive that it will be a nuisance in the instance charged in the bill. Therefore, the bill should set forth not only the use to which the building is to be devoted, but also the manner in which the building is to be used, so far as known to the plaintiff, in order that the court may see whether, in the light of human experience, the particular use will be injurious. If the answer denies the nuisance and sets forth a peculiar method of use, the effects of which are unknown, the practice now seems to be, particularly in Scotland, and its justice commends itself to all courts, to temporarily dissolve the injunction and allow the experiment to be tried to determine whether an actual nuisance will result from the particular use in question.''

In the well-known Illinois drainage canal case, State of Missouri v. State of Illinois, 180 U. S. 208, 1. c. 248, Mr. Justice Shiras, speaking for the majority of the Federal Supreme Court, said: ''We fully agree with the contention of defendants' counsel that it is settled that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence; that if the evidence be conflicting and the injury be doubtful, that conflict and doubt will be a ground for withholding an injunction; and that, where interposition by injunction is sought to restrain that which is apprehended will create a nuisance of which the complainant may complain, the proofs must show such a state of facts as will manifest the danger to be real and immediate.''

The general rule is thus clearly stated in Pope Bros. & Co. v. Gas Co., 52 W. Va. 252, 256: ''Mere possible, eventual or contingent danger is not enough. That injury will result must be shown beyond question. 'In order for equity to enjoin a private nuisance, the danger must be impending and imminent and the effect certain, not resting on hypothesis or conjecture, but established by conclusive evidence. If the injury be doubtful, eventual, or contingent, or if

the matter complained of is not *per se* a nuisance, an injunction will not be granted.' [Hough v. Doyleston, 4 Brews. (Pa.) 333, approved in Chambers v. Cramer, 49 W. Va. 395, 400.]''

As aptly expressed in McCutchen v. Blanton, 59 Miss. 116, 122: ''The principle on which the preventive aid of courts is rendered against threatened injury is well understood. . . . Great caution should be used in dealing with a matter so delicate and difficult. Every doubt should be solved against the restraint of a proprietor in the use of his own property for a purpose seemingly lawful, and conducive both to individual gain and the general welfare. Relief by injunction is so severe in its consequences that it is not to be granted in such a case, except when the right to it is clearly and conclusively made out. To interfere with one's right to use his own land for the production of what he pleases, in a case of doubt, would be a flagrant abuse of power. It is not enough to show a probable or contingent injury, but it must be shown to be inevitable and undoubted. [Wood on Nuisances, sec. 6; Green v. Lake, 54 Miss. 540.]''

So, our own court has said, in Lester Real Estate Co. v. St. Louis, 169 Mo. 227, 235, authoritatively quoting 2 Story on Equity Jurisprudence (13 Ed.) sec. 924a: ''But in all cases of this sort (i. e., threatened or anticipated nuisances), courts of equity will grant an injunction only in cases where the fact is clearly made out upon determinate and satisfactory evidence. For if the evidence be conflicting, and the injury to the public doubtful, that alone will constitute a ground for withholding this extraordinary interposition. And, indeed, the same doctrine is equally applicable to cases of private nuisance.''

Furthermore, proof of depreciation in value of contiguous property alone is not sufficient to call forth the aid of injunctive relief (Rouse v. Martin, 75 Ala. 510, 515), and ''matters that annoy by being disagreeable, unsightly and undesirable are not nuisances simply because they may to some extent affect the value of property. These are some of the natural and necessary incidents of life in a city or town, compactly built and inhabited. Those who reside or own property in such a city or settlement must rest content, so far as the law is concerned, notwithstanding they may be subjected to many such annoyances and discomforts.'' [Dallas Land and Loan Co. v. Garrett (Texas Civ. App.), 276 S. W. 471, 474.] This court has given expression to a similar thought in Van De Vere v. Kansas City, 107 Mo. 83, 91, where we said, quoting an eminent text-writer: ''Unless the owner is disturbed in the enjoyment of some right which he is entitled to make use of in connection with his property, he cannot recover. If the loss or depreciation arises from the mere proximity of the work or improvement, or from its unsightly nature or its incongruity with

the uses to which the neighboring property is put, there can be no recovery."

Nor does proof that other and existing ice plants, constructed and operated in a different manner and way than that contemplated by defendant herein, cause annoyances, tend to show that defendant's plant will cause similar annoyances. [Robinson v. Dale, 62 Texas Civ. App. 277, 279; Gavigan v. Refining Co., 40 Atl. 834; Stephens v. Creamery Co., 57 Pac. 1058.] And, while profanity, obscenity and vulgar talk may be enjoined, when shown to constitute a nuisance, the interchange of conversation among those whose business or vocation brings them together "is a matter for the police to regulate, rather than for a court to dispose of by injunction" (Thoenebe v. Mosby, 257 Penn. St. 5, 6.).

In Flood v. Consumers Co., 105 Ill. App. 559, plaintiff sought to enjoin defendant from completing a wooden building in the city of Chicago designed and intended for the storage and distribution of ice. The allegations of plaintiff's bill were quite similar to those found in the bill in the instant case. Said that court, in denying injunctive relief: "In order to create a nuisance from a use of property the use must be such as to work a tangible injury to the person or property of another, or such as renders the enjoyment of property essentially uncomfortable. It is not enough that it diminishes the value of surrounding property. It is not enough that it renders other property unsalable, or that it prevents one from letting his premises for as large a rent as before, or to as responsible tenants. It must be such a use as produces a tangible or appreciable injury to the property, or as renders its enjoyment essentially uncomfortable or inconvenient. [M. & E. Railroad Co. v. Prudden, 20 N. J. Eq. 530.] . . . A structure erected upon the owner's land is not a nuisance because it is capable of a use that will make it a nuisance. . . . It cannot be known whether noises will come from the building in loading or unloading ice. It all depends upon how and with what care the work is done. The building is to be closed up tight upon all sides except on the northern side, furthest removed from appellant's property. The sound of ice-wagons over the pavements will depend entirely upon the kind of pavements on the streets and the character of the wagons used. This matter may or may not be regulated by an ordinance of the city council and, in any event, it is altogether too conjectural in its consequences to require the extraordinary writ of the court. It is suggested in the bill that offensive odors will come from the horses attached to the ice-wagons, being and standing near appellant's property. Again we say this objection depends entirely upon where the horses are stationed, their number and the care and attention given to them. . . . A court of equity will not restrain the erection of a building by an owner upon his property, unless it

is clear that the business to be carried on therein will be a nuisance and that it cannot be carried on thereon so as not to be a nuisance. [Duncan v. Hayes, 22 N. J. Eq. 25; Iliff v. School Directors, 45 Ill. App. 419.] Ordinarily an injunction will be granted when the act or thing threatened is a nuisance *per se*, or necessarily will be a nuisance, and will be denied when it may or may not be a nuisance, according to circumstances, or when the injury apprehended is doubtful or contingent. [Lake View v. Letz, 44 Ill. 81; Duncan v. Hayes, supra.] The jurisdiction of courts of equity over the subject of nuisances is not an original jurisdiction. This power was formerly exercised very sparingly, only in extreme cases, at least until after the right and question of nuisance had been first settled at law. While in modern times the strictness of this rule has been somewhat relaxed, there is still a substantial agreement among the authorities that, to entitle a party to equitable relief before resorting to a court of law, his case must be clear and free from all substantial doubt as to his right to relief. To entitle him to come into a court of equity in the first instance there must be a 'strong and mischievous case of pressing necessity.' [Oswald v. Wolf, 129 Ill. 200; Nelson v. Milligan, 151 Ill. 462; Windfall Mfg. Co. v. Patterson, 148 Ind. 414.]''

Similar conclusions were reached, based upon like reasons, in Goose Creek Ice Co. v. Wood, 223 S. W. 324; Lindblom v. Purity Ice and Ref. Co., 217 Ill. App. 306; LeBlanc v. Orleans Ice Mfg. Co., 121 La. 250; and Knaub v. Meyer, 141 N. Y. Supp. 819, all of which cases involved the question whether the erection and operation of a plant for the manufacture and distribution of ice constituted, or would certainly and inevitably constitute, a nuisance.

Applying the principles announced by the weight of judicial authority, as above stated, to the facts in evidence, as disclosed by the record herein, we cannot say that plaintiffs' right to the injunctive relief granted by the learned trial chancellor's decree herein is clear and free from all substantial doubt, or that the proof respecting the apprehended danger or result in the operation of defendant's contemplated ice plant shows such a state of facts as clearly manifests the apprehended danger to be real, certain, inevitable and immediate. Having reached that conclusion only after a careful and exhaustive review of the judicial authorities bearing upon the subject and cited by respective counsel, and after having made a scrutinous analysis of the evidence contained in a rather voluminous record, we are convinced that the decree of the circuit court is wrong and that it must be reversed outright. In arriving at such conclusion, we have given careful consideration to the several judicial authorities cited by respondents' learned counsel in his brief, reference to which authorities discloses that they dealt largely, if not entirely, with the subject of abatement of existing nuisances, to which character or

class of cases an entirely different, and much more liberal, rule of evidence and practice applies than the rule of evidence and practice which is uniformly applied in actions which seek to enjoin an apprehended or potential nuisance. We believe that the authorities herein quoted make clear the distinction and applicability of these widely different rules of evidence and practice. If, perchance, the plaintiffs, or any of them, are hereafter damaged, or unlawfully or unreasonably annoyed, by the method of the operation of defendant's plant, or by the manner of operation of any phase or department thereof, then they are free to pursue any appropriate and available remedy by suit or action, whether for relief by way of injunction, recovery of consequential damages, or otherwise, without prejudice by reason of our opinion on this appeal.

It follows that the decree and judgment *nisi* must be reversed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The opinion of Seddon, C., in Division One is adopted as the opinion of Court en Banc. All the judges concur, except *Walker, C. J.,* and *Ragland, J.,* who dissent. *Graves, J.,* concurs in separate opinion.

GRAVES, J., (concurring).—We examined the motion for rehearing in Division, and prepared an opinion thereon, but Seddon, C., changed his original opinion, and the change made some things said in our opinion inappropos, and we did not file it. We examined the record in this case and directed the appeal herein. In examining such record for error we were not unmindful of the question of jurisdiction. We were then convinced that the record which we examined showed conclusively that much more than $7500 was involved. We have gone over the record again, as the same is now printed and on file. This second examination leads us to concur fully in the present opinion of Seddon, C., but we shall give some further reasons for the concurrence. We are so thoroughly convinced that the record from the lower court shows our jurisdiction on the theory of the amount involved, that we want to spread upon our records (the opinions in this case) some of the patent facts (contained in the record) that unerringly show the appellate jurisdiction to be in this court on account of the amount involved, as well as for other reasons, which might be assigned. Respondents *now* stress the question of jurisdiction. Most of the brief is devoted to it. However, in no brief, filed up to this date, is it claimed that more than $7500 is not involved. We reiterate no claim is made, in brief or otherwise, that, *as a fact,* less than $7500 is involved. The *only claim* is that the record from the circuit court fails to show that more than $7500 is involved. Now for the record facts.

We take first the amount involved on the side of plaintiff. The petition says that the four named plaintiffs are property owners and locates their respective properties. The petition then says:

"That these plaintiffs bring this suit not only in their own behalf, but at the request and on behalf of thirty-seven other residents and property owners in said neighborhood, and as representatives of a class of other residents and property owners in said neighborhood, too numerous to be joined as plaintiffs herein, who are threatened with similar irreparable injury and damage, and have the same causes of complaint as plaintiffs allege herein."

Thus we have involved herein at least forty-one properties in the particular district or neighborhood. A list introduced in evidence shows forty-three signers. The evidence shows that these parties had an organization, and had a secretary-treasurer, who looked after financing this lawsuit. Of the forty-three signers (which included the four named in the petition) thirteen were on Obear Avenue, twenty-two on John, five on Penrose Street, three on Gano, and one on Grand Avenue. But reverting to further admitted facts in the petition, we find, as to the measure of damages the following, viz:

"(a)  The character of the structure and plant, and the nature of the business carried on therein and thereat, in a residential neighborhood, and alleged herein, will *greatly* and *unreasonably destroy and depreciate the market value* of the property of these plaintiffs.

"(b)  The noises, odors, mists, dust and dirt, emanating from the operation of said plant, and created thereby, as aforesaid, will be so great to unusually disturb the comfort and quietude of plaintiffs and the members of their households, and to render their homes uninhabitable with any reasonable degree of comfort and peace, and will so greatly disturb the sleep and rest of the plaintiffs, and the members of their households, as to force them to abandon their homes, or become ill and sick therefrom, thereby inflicting *upon plaintiffs and their property great* and irreparable injury and damage."

In the decree the court says:

"That the operation of said plant, in the manner as aforesaid, *will materially and substantially reduce and impair the financial value of the property| of these plaintiffs; that the character of the building as planned by defendant alone is such as to materially and substantially impair and reduce the financial value of the property of the plaintiffs.*"

Note the petition says that the building and operating of the plant will "greatly . . . *destroy* and depreciate the material value" of the properties. Not nominally, but *greatly* reduce values. These are admissions of record, and must be given the force of such. Note also the decree and its language upon this subject. The value of these properties, according to the decree, will be materially and sub-

stantially reduced, (1) by the planned operation of the ice plant, and (2) by the mere character of the building (ice plant building), without considering its operation. The decree takes a double shot at the reduced values of these properties. We emphasize these record admissions, because of their applicability to other facts as to values likewise apparent in the record, by proof other than by admission, as are the facts, supra. First we give some facts as to the land value in the vicinity of the land involved in this law suit, and then some photographs of some of the properties involved. Plaintiff Aufderheide, in his testimony in speaking of a lot in the exact vicinity of the property of the plaintiffs (the forty-three parties), and around which much of their property is built, says that the owner offered to take $150 per foot for it, and was offered $125 per foot. The offer to buy at $125 per foot is very strong evidence of value. The property for which was offered $125 per foot was a part of the south part of the property now owned by defendant, at the corner of Penrose Street and Obear Avenue. The surroundings can best be described by a plat in evidence of City Block 2485.

City Block 2485. Ice Plant in southwest corner of it. Aufderheide property just south of it.

Of this City Block 2485 the defendant now has all the south part, being 314 feet and five and one-half inches on Penrose Street, by 363 feet and one-inch on Obear Avenue and Grand Avenue.

Aufderheide has something over 154 feet on the south side of Penrose Street, and just across the street from the ice plant of defendant. Three named plaintiffs, and ten more of the forty-three parties interested and bound by this lawsuit, own property on Obear Avenue, just across the street, on the west from City Block 2485.

Just west of Obear Avenue is John Avenue, and twenty-two of these parties own property and are domiciled on that street. Further west and next to John is Gano, and three own property there. With

Aufderheide, there are four others on Penrose, and one on Grand Avenue. Aufderheide compares his lots with those of defendant. He says both properties were "filled in" but there was more "filling in" on defendant's property. He rather makes out his lots better than those for which he and the then owner were offered $125 per front foot.

At the southeast corner of Grand Avenue and Penrose Street, Anthony Potolsky bought, in January, 1923, a row of flats (three double and one single flat, or four in all) and paid $15,500. He says that he put in $5000 upon them, and now rents them for $200 per month. The lot is 109 feet on Grand Avenue by 126 feet on Penrose. He says he would not have bought had he known that the ice plant was to be built, but also says (at the trial), after he did know the plant was being constructed, that he would not take $20,000 for the row of old brick flats. The photograph *below*, plaintiffs' Exhibit 13, shows the character of the flats.

Brick flats of Anthony Potolsky for which he paid $142 per front foot for lot and building.

These flats, in fact, constitute one structure with a frontage of 109 feet on Grand Avenue. Potolsky paid $142 per front foot for lot and building. It is this fact that is of importance. Above we have given the record admissions and the court adjudications as to the depreciation of the property of the plaintiffs. The evidence takes a little broader range. One witness who lives and owns a residence across the street from one of defendants' ice plants (it has in the city eleven manufacturing plants and in addition eleven storage plants), says: "Judge ARNOLD; Q. Can't get *anything* for it can you? A. Well, *hardly*." The evidence therefore ranges from "hardly anything" on down. As to effect on value other witnesses say, "Substantial reduction;" makes property "hard to *rent*" and affects

rental value; property is "adversely and detrimentally affected; will depreciate the value for rental purposes;" location of ice plant "would be *very detrimental;* and, "would depreciate value and make sale of property more difficult." Such are samples of the evidence.

The foregoing admissions in the pleadings, adjudications in the decree, and evidence of witnesses clearly tend to show that property values would be reduced not less than twenty-five per cent, if not much more than twenty-five per cent. It is safe to say twenty-five per cent, or one-fourth.

The character of the improvements on the property of the forty-three interested parties is shown by pictures which plaintiffs introduced. From them some idea of value can be gleaned. These pictures are below and on the following page.

Property of plaintiff Aufderheide, with garage between the buildings.

Houses just across Obear Avenue and west of City Block No. 2485. Thirteen plaintiffs live here.

Residences at Obear and Penrose.

The unmarked pictures in Ex. 20 are of houses on Gano Ave.

This will suffice for a discussion of the amount involved from plaintiff's side of the case, as such is involved under the rule. The amount on both sides of the case is for consideration, as we see the law, and this rule we discuss next.

I. One of the clearest legal minds that ever graced an appellate bench in Missouri formulated the Missouri rule of determining jurisdiction in cases wherein relief other than a money judgment is involved.

That rule (Evens & Howard Fire Brick Co. v. St. L. Smeltering & Ref. Co., 48 Mo. App. l. c. 635), reads:

"It is settled that, where the right of appeal depends on the value of the matter in dispute, such value must be estimated in money. When the object of the suit, however, is not to obtain a money judgment, *but other relief,* the amount involved must be determined by the value in money *of the relief to the plaintiff, or of the loss to the defendant,* should the relief be granted, or *vice versa,* should the relief be denied. *If either is necessarily in excess of the sum within the appellate jurisdiction of this court,* then the Supreme Court has exclusive cognizance of the appeal. We took this view in the case of Gartside v. Gartside, 42 Mo. App. 513, in transferring that case to the Supreme Court, and that court, in refusing to remand the cause to us upon a motion made to that effect, affirmed our holding."

It will be observed that the learned writer was particular, in a few words, to say that if the amount involved upon *either side* exceeded the jurisdiction of the Court of Appeals, the jurisdiction was in the Supreme Court. There was a reason for this rule. If plaintiff had judgment his relief gained might exceed $7500, whereas the loss to defendant (appellant) might be much under $7500. If loss to defendant (appellant) alone controlled, the plaintiff might lose his judgment (for relief in value much more than $7500) in an appellate court which had no jurisdiction over the amount involved in plaintiff's judgment. Hence the rule says: "If either (plaintiff's gain or defendant's loss or *vice versa*), is necessarily in excess of the sum within the appellate jurisdiction of this court (Court of Appeals) then the Supreme Court has exclusive cognizance of the appeal." The learned jurist who formulated the rule had made a thorough review of the cases in the Federal courts in the case of Gartside v. Gartside, 42 Mo. App. 513, and from them gathered the fundamentals of our rule. All of our well-considered cases have endorsed and followed this rule. [Gast Bank Note & Lithograph Co. v. Fennimore Assn., 147 Mo. l. c. 559; State ex rel. E. L. & P. Co. v. Reynolds, 256 Mo. l. c. 718 and 719; McCoy v. Randall, 222 Mo. l. c. 33 and 34; Clothing Co. v. Watson, 168 Mo. l. c. 143; Garlich Agency Co. v. Anderson, 284 Mo. l. c. 204; Bowles v. Troll, 262 Mo. l. c. 381 and 382.] All these cases approve the rule in 48 Mo. App. l. c. 635, quoted supra.

II. We have further ruled that the record in the lower court must bespeak facts sufficient to show the jurisdictional amount. Subsequently filed affidavits showing the amount involved will not be considered. In such record from the court *nisi,* the amount involved does not have to appear in figures, and in dollars and cents, either by pleadings or evidence, but facts must appear in the record from such court which do show an estimated amount of more than $7500

in cases where relief other than a money judgment is sought. [State ex rel. v. Reynolds, 256 Mo. 1. c. 718.]

We must consider the *whole* record from the court *nisi*. [State ex rel. v. Reynolds, supra; Vordick v. Vordick, 281 Mo. 279; Tureman v. Ketterlin, 304 Mo. 221; Vanderberg v. Gas Co., 199 Mo. 455.] In the latter case LAMM, J., thoroughly reviews all the cases. See page 460 of 199 Mo. where it is said that we are not even bound by the petition as to amount involved, when the other facts of the record show the contrary. It suffices, in these cases wherein relief other than a money judgment is sought, for the record to show facts from which it may be seen and estimated that more than $7500 is, *in fact*, involved. These facts may come from the petition, and the admissions therein as in State ex rel. v. Reynolds, supra. They may come from the consideration of the entire record as in Vordick v. Vordick, and Tureman v. Ketterlin, supra. What we emphasize is, that it is not required to show from the record that some witness has stated the value of the relief granted to plaintiff to be so many dollars and cents. It suffices if the record shows facts from which this court should conclude that more than $7500 is involved. What we have said of the plaintiff applies to the loss suffered by defendant.

III. With the facts stated, let us see as to the amount and value of the relief granted to plaintiffs. We take the four plaintiffs named in the petition first, and the others later. We also take the value of their mere naked lots first. Aufderheide has at least 154 front feet (we think quite a bit more) which at $125 per front foot gives $19,150 as the value of his lots. The decree saves him at least twenty-five per cent of this value as we have stated, supra. The evidence and the record shows that the damages to his property (by the erection and operating of the ice plant) would be at least one-fourth of its value. The record admission, as to the depreciation of their property, in this petition, would make it more than twenty-five per cent, and by these admissions they are bound here. These admissions are set out, supra. The relief to him would be $4787.50. Three others of the named plaintiffs live on Obear Avenue. The pictures in evidence show (by the character of the houses thereon) that these lots can't be less than twenty-five feet frontage each. They are no doubt fifty feet, as were the lots in Block 2485 just opposite. This gives seventy-five feet of frontage on Obear Avenue, which at $125 per foot aggregate $9375 as the value of these lots without the houses. The relief granted would be one-fourth of this sum, or $2343.75. Now add this $2343.75 to Aufderheide's $4787.50 and we have $7131.25 as the money value of the relief granted to the four named plaintiffs on their naked lots alone. That the three houses on Aufderheide's property and the three on Obear Avenue (owned by the other three

named plaintiffs) are worth very much more than $2000 each is a fact apparent to the humblest citizen from the pictures placed in the record by plaintiffs themselves. Here we have at least $10,000 (nearer $40,000 in my judgment) as the value of the houses, and one-fourth of that would be $2500, the relief granted. Add this $2500 to the $7131.25 (value of relief granted to the lots alone) and we have $9631.25 for the relief (estimated in money) granted by the decree to these four named plaintiffs alone. This suffices for our jurisdiction. But suppose we take the purchase price of the Potolsky flats as a basis for an estimate, in money, of the properties of these same four plaintiffs. For his improved lot Potolsky paid $142 per front foot. The picture clearly indicates that the improvements on plaintiff's properties are at least as good. We would have (belonging to the four named plaintiffs) 229 feet of improved property at $142 per foot which gives a total value of $32,518. Relief granted by decree one-fourth of this is $8129.25, which shows our jurisdiction. These money values of relief granted are from facts in the record. *But this is not all. We have 39 others receiving the same relief, and receiving it at the suit of the four, and made plaintiffs by the petition. They paid for and prosecuted this suit. When these are considered* (as they must be), *and the money value of the relief given them by the decree is added, we have many times* $7500.

If plaintiffs had any idea of thwarting the jurisdiction of this court (which they did not—this idea being a pure afterthought), they were playing with fire when they introduced pictures of their property. Pictures give to the average man an idea of value, and courts must know things which everybody knows. [Home Telephone Co. v. Sarcoxie Telephone Co., 236 Mo. l. c. 127.] We don't mean that everybody is an expert on the value of a house, but everybody knows that a given described house (described in and by a picture) has some substantial value and a fair idea of such value. We mean to say that such average citizen can safely say that such house cannot be worth less than so much money. With the picture in evidence (some evidence of value) the courts must know as much as the average general public knows. The evidence shows that one of the houses on Obear Avenue is a five-room cottage, and the picture shows it to be one of the smaller houses on Obear Avenue, and it belongs to one of the named plaintiffs.

So from any angle the relief granted to plaintiffs exceeds the jurisdictional amount of $7500.

IV. We go now to record facts as to amount involved on defendant's side of the case, under the decree rendered herein. Of the size of the building the petition (admissions of record herein) says:

"That defendant has acquired a lot of ground on the southwest corner of said City Block No. 2485, not more than sixty feet distant from said residences of these plaintiffs, and is now proceeding to erect and construct thereon, *a large brick building to* be used by it for the purpose of manufacturing, storing and selling ice therein and therefrom; *that the walls of said building will be sixty feet high, by one hundred and twenty-two and two hundred and twenty-seven feet in length, and will abut or be within a few feet of the sidewalk lines of Obear and Penrose avenues."*

Ice plants must have a cooling system, and of this cooling system the petition of plaintiffs says:

"That the process of making ice, which defendant has planned and intends to use at said plant, contemplates the construction of a cooling system at or near the top of said building, and from thirty-five to fifty feet above the street, consisting of a large number of coils of iron pipe two or three inches in diameter, the length and number of which are unknown to plaintiffs, over which a constant flow of water will be maintained, day and night, that will fall through the open air, some ten or twenty feet to a receptacle beneath.

*"That heavy machinery* is intended to and will be necessary, in manufacturing ice in said plant, and the operation of said machinery will be constant throughout the day and night, and will, by reason thereof, make continuous and disturbing noises during the usual hours of rest."

Of this building and the machinery to be used therein the decree says:

"That the plans adopted by said defendant for the construction of said ice manufactory provided for the erection of, and said defendant intends to and will erect, and is now engaged in erecting, *a large building of brick, tile and steel,* abutting the sidewalk lines of Penrose and Obear avenues, at or near their intersection; that said building when completed *will be thirty-nine feet in height, will extend approximately two hundred and ten feet along Obear Avenue and one hundred and twenty-one feet along Penrose Street;* that when completed said building will have a storage capacity for ten thousand tons of ice, and it is the plan and intention of said defendant to and said defendant *will install in said building electrically driven machinery, of a large and heavy type, and a sufficient number of ice tanks or cans to manufacture seventy tons of ice per day."*

The petition is a general admission of record as to the general character of the building and machinery. The plans were changed in the course of construction, and the decree is a better description of the building and machinery, but it will be necessary to go to the evidence, because it tends to show an investment of *many, many* thousands of dollars, much of which would be wiped out by the en-

forcement of the decree rendered herein, and now before us upon the appeal. Both sides, in the briefs, treat the building as completed and in operation. No injunction bond was given at the time the suit was filed, or since.

The building fronts south on Penrose Street. A ground plan or plat of it is shown by defendant's Exhibit 17, which is here given.

Ground Plan of the Ice Plant involved in this action. The alley is all on defendant's lots, and east of the alley is defendant's property.

"As we gather the facts the frontage of the building on Penrose Street is 121 feet. Note therein the engine room, tank room, shipping room and platform. This portion of the building is thirty-nine feet high, but fourteen feet of this is above the roof and is the cooling plant. This space above the roof is (as we gather the record) 121 feet (fronting on Penrose Street) by ninety feet, and is surrounded by four walls fourteen feet above the roof. The south and north walls would be 121 feet long and the east and west walls ninety feet long, by fourteen feet in height. In three of these walls are built the louvers, or openings for the free admission of the air, to thoroughly aeriate the water of the cooling system. We give these facts, because all the expense of building the fourteen foot walls above the roof (of brick and terra cotta) would be an absolute loss, except for the salvage of second-hand brick, in the event the decree stands. No other business could use these walls aggregating 422 feet in length by fourteen feet in height. So also all the machinery for the water sprays of the cooling system would be a dead loss. The loss at this one point would more than cover the jurisdictional amount. We have some idea of the cost of brick and the wages of brick-layers. The salvage in second-hand brick would hardly pay for removing the

superfluous walls, if the decree be enforced, thus leaving the original cost of brick and the wages for building 422 feet of wall in length, by fourteen feet in height, a dead loss. Not only so, but the freezing tank is thirty-nine by ninety feet, in which is used 1000 metal cans for freezing the water into ice. These cans are forty-four inches high with a base of 11x22 inches, so as to hold water enough to make a 300-pound block of ice. It requires 1000 of these metal cans to make a daily output of seventy tons of ice. Then there is a hot-water vat through which these cans pass to loosen up the ice before taking it out in the storage or loading room. These vats would be a total loss (and their construction would be very expensive under the evidence, although no figures are given), because they belong to ice plants only. The freezing cans (1000 of them) become mere junk when the plant is closed. The engines used would become second-hand junk. At the Victor plant of defendant (the plant constructed just before the instant Penrose Street plant) they use the following engines: One 125-horse-power, two 150-horse-power, two 40-horse-power, two 25-horse-power, *several* 3-horse-power and a *couple* of 2-horse-power. Everything is moved by engines and cranes. The plant involved here is shown to be the most modern and complete plant anywhere up to the date of its construction. Evidently it has machinery as complete and parts as numerous as at the Victor plant, its immediate predecessor, in point of construction. This machinery could not be dismanteled within the jurisdictional amount of our appellate jurisdiction. Defendant's Exhibit 16 gives a fair outline of the plant here involved. Plaintiff's Exhibits 5, 6 and 7 show three sides of the Victor plant, and plaintiff's Exhibit 23 shows another of defendant's plants. We insert these, so that some conception may be had of the cost of ice plants and the consequent damage flowing from the decree in this case.

One view of the defendant's Victor plant.

A second view of the Victor plant of defendant.

A third view of the Victor plant.

Another of the 11 or 12 Ice Plants of defendant, located at Kingshighway and Natural Bridge Road.

These are pictures showing elevations of the plant in dispute, taken from blue prints.

We are not so ignorant as not to know that *many*, yes, *very many*, thousands of dollars are invested in the Penrose Street plant, which must be dismanteled under the decree. From the record facts (only a part of which we have detailed), we must know that this decree will inflict damages and loss upon defendant, several times our jurisdictional amount of $7500. However, under the law, if the

amount involved upon either side is above $7500, this court has jurisdiction. We think we have demonstrated from record facts that from either side of the case, the amount involved exceeds our jurisdiction.

V. A re-reading of the record in this case discloses to my mind a constitutional question. The petition of the plaintiffs says:

"Plaintiffs further state that defendant intends to and will erect, maintain and operate said plant as alleged herein, unless enjoined therefrom by this Honorable Court; that if said plant is erected and operated as aforesaid, then, by reason of the premises, plaintiffs will be deprived of their property without due process of law, in violation of Section 1 of the Fourteenth Amendment of the Constitution of the United States, and Section 30 of Article II of the Constitution of Missouri."

The answer reads:

"Comes now defendant in the above-entitled case and for answer to the amended petition of plaintiffs denies each and every allegation therein contained.

"Wherefore, having fully answered, this defendant prays to be dismissed with its costs."

Among other things the decree says:

"And the cause having been duly submitted for the decision and final decree of the court, and the court being duly and fully advised in the premises, doth find the *issues herein joined* in favor of the plaintiffs and against the defendant, Polar Wave Ice & Fuel Company, and that plaintiffs are entitled to the *relief prayed for in their petition.*"

The issues joined (the constitutional question was one of the issues joined) were all found in favor of plaintiffs and *against* the defendant.

In other words the decree upholds the contentions of plaintiffs as to the constitutional question by finding *all* issues in favor of plaintiffs, and the decree finds *against* the defendant, when in its answer (general denial) the defendant said it was not encroaching upon, or violating, the constitutional rights of the plaintiffs, as by them charged in their petition. So in this case we have the constitutional question not only raised and brought to an issue in the pleadings (the earliest possible time), but we have the court passing upon it in its decree. Not only so, but passing upon it *against* the contention of the defendant, the appellant here. In such case this question alone suffices for the jurisdiction of this court over the appeal herein.

In the rather early case of Bennett v. Ry. Co., 105 Mo. l. c. 644, MACFARLANE, J., said:

"The question here presented is whether this court or the St. Louis Court of Appeals has appellate jurisdiction of the subject-matter of this case. It is quite clear that the jurisdiction is to be determined, not from what has been done in the appellate court, but from the record as it was when the appeal was taken. The jurisdiction is then fixed, and nothing the parties can do afterwards will change it.

"The proposition then is, did the record in this case, when the appeal was allowed, present a question involving the construction of the Constitution of the United States, or of this State. This must be determined by an inspection of the record itself as it came from the St. Louis Circuit Court.

"The word 'involving,' as used by the Constitution, in fixing the appellate jurisdiction of this court, implies that a constitutional question was raised in and submitted to the trial court, and that such court *had the opportunity to pass upon it*. It cannot be laid down by rule how every such question must be raised in the trial court, but it should, at least, be fairly and directly presented by some of the methods recognized by the practice and procedure of the court. [State ex rel. Campbell v. St. Louis Court of Appeals, 97 Mo. 278; Railroad v. Seifert, 41 Mo. App. 37.]"

The italics, supra, are ours. In the instant case, the court not only had the opportunity to pass upon the constitutional question, but in its decree did pass upon it against the contention of appellant.

We admit that what we are now discussing is not the ordinary and usual lodgment of a constitutional question. Ordinarily it is the party having his own constitutional question ruled against him that appeals, and thus brings into the case the question. The petition here, however, charges that the erection and maintenance of this ice plant is the taking of plaintiffs' property without due process of law in violation of named portions of both State and Federal Constitutions. The plaintiffs inject this issue, which involves the constitutional question. The defendant denies this portion as well as all other parts of the petition. The court, by its decree, finds *all* the issues for plaintiffs, thus saying by its decree, that the erection and maintenance of this ice plant constitutes the taking of the property of plaintiffs without due process of law, and thus saying to defendant you were wrong, when by your answer, you denied that your conduct *violated* the constitutional rights of plaintiffs, but you did violate their constitutional rights. From this decree of the court the defendant has appealed. This finding of the court on this constitutional question, defendant asks this court to reverse. Is there a live constitutional question here? We think so. We can't reverse this portion of the

decree *nisi,* without passing upon the constitutional questions thus injected into the case, and thus determined by the decree.

The defendant, in some four grounds of its motion for new trial, raises, by specific mention of the portions of the State and Federal Constitution, constitutional questions, such as the taking of its property without due process of law, denial of the equal protection of the law, etc., but we think a constitutional question is squarely in this case, without considering those parts of defendant's motion for new trial which lodge the questions in the case.

The question as to title to real estate being involved we shall not discuss, but leave that to a case where such question is the sole issue. We have enough in this record to show clearly our jurisdiction, without more.

VI.  Just a word on the merits, in addition to what our learned Commissioner has written.  Again the faithful photographs must be considered.  There are a number of them.  When all are considered, it clearly appears that the property of these plaintiffs is merely upon the border line separating residential territory from commercial and business property, and that the property of the defendant, was, when bought, and when the improvement started, within a district (as a fact) overwhelmingly devoted to business, commercial and manufacturing purposes.  Many of the houses, even on Obear Avenue were erected after defendant bought its property, and it was known that the property was bought for an ice plant.  So we not only have jurisdiction, but the plaintiffs, on the facts, failed to make their case.

I therefore concur in the opinion of our Commissioner. *White, Atwood* and *Gantt, JJ.,* concur in these views as well as in the opinion of SEDDON, C.

### ON MOTION FOR REHEARING.

GRAVES, J.—The motion for rehearing, by respondents, is directed very largely to the separate concurring opinion, therefore these observations.  No serious argument was made at the hearing in Court en Banc (nor at any other time) on the merits of the decree *nisi,* and none can be made. The promised argument (en Banc), upon the merits, consisted solely of reading to the court an excerpt from the decree *nisi,* and this excerpt from the decree was prepared bodily from the petition in the case, and not from the evidence, so far as the ice plant involved in *this cause* is concerned.  Thrice have we read the entire record in this case, and viewed every photograph therein, and we reiterate that the decree *nisi* is without support in the record evidence as to the new and up-to-date plant involved in this case. But the opinion of SEDDON, C., fully cares for this matter, and we go to the things urged in the present motion for rehearing.  We shall be brief, but pointed.

1. Respondents are exceedingly solicitous about our overruling (as they think) cases heretofore written on the question of meritless constitutional questions as urged in behalf of our jurisdiction. They cite six cases, as follows: Brookline Canning Co. v. Evans, 238 Mo. 599: Botts v. Railway Co.. 248 Mo. 56, l. c. 61; Segall v. Pigment Co., 263 Mo. 719; Bealmer v. Ins. Co., 281 Mo. 495, l. c. 505; McManus v. Burrows, 217 S. W. 512; State v. Tatam, 278 S'. W. l. c. 714 and 715.

Respondents seem to fear that this court will be flooded with cases wherein colorless and meritless constitutional questions are charged to give jurisdiction here, if the ruling in the concurring opinion is permitted to stand. All the *cases supra* go to meritless and colorless constitutional questions to foist appellate jurisdiction upon this court. No member of this court has written more strongly upon this question than the writer hereof in Carson v. M. K. & T. Ry. Co., 184 S. W. l. c. 1041, whereat we said: "There must at least be some substance to the constitutional question before it possesses the vitality to force jurisdiction here." This statement of ours was quoted approvingly by Goode, J., in McManus v. Burrows, 217 S. W. l. c. 514, cited by respondents, supra. Nothing in the concurring opinion contravenes either of the cases cited, supra. What we said in the concurring opinion was, in effect, upholding the rule announced in each and all of the several cases, supra. We said that the question was not lodged in the usual way, but that plaintiffs had put the question (whether substantial or colorless), into the case, and had induced the trial court, over the denial of the defendant, to find that there was a taking of the property of the plaintiffs without due process of law. and all in violation of named sections of both State and Federal constitutions. When this court affirms the decree of a trial court it affirms *all the findings and adjudications* in such decree. In this case, we repeat, this court cannot affirm the decree herein without saying that the alleged acts of the defendant violated the constitutional rights of the plaintiffs (as in the petition stated), and this finding in the decree was over the denial of the defendant. and from such ruling the defendant appealed. If we affirm this decree, we affirm all that is said therein, and if the constitutional questions are without substance, this court declares them to have substance. as the trial court *did* when it entered such decree. In plain terms this court cannot affirm the decree *nisi* without saying that there are not only constitutional questions involved, but that they are of substance. When this court affirms this judgment, if it ever does. it says what the trial court found and decreed in the decree *nisi*. The trial court found that there were substantial constitutional questions. Our ruling in the concurring opinion is in full harmony with every opinion cited in the motion for rehearing, and set out, supra. Nor can plaintiffs urge surprise in that this part of the decree is commented upon

in the opinion. It is a part of the decree, lodged there by the action of the plaintiffs, and upon appeal they must expect to have to uphold, and be prepared to uphold, each finding in such decree. In the situation plaintiffs should be the last ones to suggest the meritlessness of the constitutional question. They are estopped by the fact that they pleaded it, and induced the trial court to write it in the decree.

2. Next it is urged that we can only consider the relief granted to one of the divers plaintiffs involved herein. Even if this were true the jurisdiction would be in this court. In the separate concurring opinion we made only the very lowest minimum estimates of the relief granted in money value of such relief. To illustrate we took lots on Obear Avenue, at the minimum of twenty-five feet frontage, when all the facts indicated them to be fifty-foot lots, just as they are in the city block whereon the ice plant has been erected. If the law is, as lately contended (en Banc) by respondents (which we do not concede), yet Aufderheide, by his own record admissions, has shown that his damage, and consequently *his relief*, was far in excess of $7500. In the petition he says that the building and maintenance of this ice plant, "will greatly and unreasonably *destroy* . . . the market value of the property of these plaintiffs," and he was one of them. Further on Aufderheide (in the petition) admits that he and the other plaintiffs would, by reason of the named conditions, be forced to "*abandon their homes*, or become ill and sick therefrom." Homes that have to be abandoned are worthless. We are entitled to use these written admissions, and we therefore have Aufderheide's property of over two hundred feet practically destroyed, when he himself had asked $150 per front foot for property just across the street, and had actually been offered $125 per front foot for it. This was mere vacant property. Aufderheide's property is highly improved. This court could well say that Aufderheide alone received relief, by the decree, according to his admissions of record, of very much more than the jurisdictional amount. By one witness it is shown that vacant lots across from the saw-mill (in the same block as the ice plant) were reduced to $20 per foot by reason of the hum of the saw-mill. This vacant property for which Aufderheide was offered $125 per front foot, and asked $150, was in the same immediate vicinity. So if we have to be guided by the relief, estimated in money, of only one plaintiff (which we do not concede), Aufderheide has shown in his record admissions, and by the evidence, that he alone has received much more than $7500 relief by the decree.

3. In contending that the sum total of the relief granted by the decree to all the plaintiffs cannot be considered as the jurisdictional amount, we are cited to 3 Corpus Juris, paragraph 209, page 411,

384

and to Ogden City v. Armstrong, 168 U. S. 224. Respondents overlook 3 Corpus Juris, paragraph 215, page 415, of the same volume, whereat it is said:

"Where several plaintiffs seek one judgment for the enforcement of their several demands, such demands being founded upon the same liability, the aggregate amount is held to furnish the criterion of appellate jurisdiction in their behalf, and defendant may appeal, notwithstanding the interest of each plaintiff in the judgment would not be of sufficient amount to confer jurisdiction. And where the amount decreed against appellant consists of several sums in favor of various appellees, no one of which sums would come within the jurisdictional amount, but the aggregate of which amount is in excess of the jurisdictional limit, it is held that defendant may appeal."

Respondents overlook the further fact that their citation of paragraph 209, page 411, of 3 Corpus Juris, is a statement of a rule announced very largely by the Federal courts, and not by Missouri courts, and courts of other states wherein there is a Code of Procedure, rather than the Federal rules of court in equity cases. Respondents could have added that the Federal courts have permitted the jurisdictional amount to be shown by affidavits (filed after judgment in lower court), as to the money value of the relief granted in the equity proceeding below. In other words they do not always take the facts of the record *nisi*, as conclusive of jurisdiction, but permit supplemental affidavits, a thing the courts of this State condemn. [State ex rel. v. Reynolds, 256 Mo. 710, and the cases reviewed therein.] Our Practice Act is left clear out of consideration by respondents, as is also its effects on the judgment appealed from in the present case. Our Practice Act provides for the consolidation of cases, and if the judgment after consolidation, suffices for jurisdiction, this court has it and will take it. [State ex rel. v. Fraser, 165 Mo. l. c. 256—opinion by BURGESS, J., concurred in by GANTT and SHERWOOD, JJ.] Neither of the suits, in the Fraser case (afterward consolidated under the Practice Act), was for sufficient amount to place jurisdiction in this court, but we retained jurisdiction in the case. The cases were separate causes of action. Respondents overlook the further fact, that under our code, and the practice generally, one or more plaintiffs, may sue for themselves, and others similarly situated. Such was done in this case. The petition was not demurrable on any ground, in our judgment, and but one judgment could be entered, which covered all plaintiffs. Further had the forty-three parties in interest in this case brought separate suits to enjoin the building and operation of this ice plant, under our Practice Act they could have been consolidated, and one single judgment entered for the relief prayed. Under the case of State ex rel. v. Fraser, supra, the aggregate sum of the consolidated actions would determine the

jurisdiction. *Don't forget that there is a difference between rules under State practice acts, and mere court rules in Federal equitable cases.*

Further evidencing the Missouri rule are the cases of Priest v. Deaver, 21 Mo. App. 209, and, Washington Savings Bank v. Butchers & Drover's Bank, 61 Mo. App. 449, both of which cases, and the rulings therein, are cited with approval by this court in Bradley v. Ins. Co., 147 Mo. l. c. 638. In the Priest case, supra, the plaintiff had judgment entered for more than the jurisdictional amount, but no defendant was liable for more than $1204.85, and their several separate adjudicated judgments against them ranged from $267.75 to the $1204.85. No defendant had been adjudged to pay the jurisdictional sum of $2500, yet they were permitted to add up all of them. The Court of Appeals ruled that the appeal of the defendants was in the Supreme Court, and as said this court spoke approvingly of such disposition of that case by the Court of Appeals in the Bradley case, supra. To like effect is the case in 61 Mo. App., supra. Our rule, which we set out fully in the concurring opinion, accords with our Practice Act, and the rulings thereunder. Under it the interests of all these plaintiffs must be considered, and as the parties had the right to sue, as they did, and as under the code but one judgment could be rendered in their favor, the full relief granted by such judgment must be estimated in money, in determining the amount in dispute, for the purpose of fixing jurisdiction.

4. But aside from all this the amount involved upon defendant's side of the case is sufficient. Had we the Federal rule, as announced in some of their cases, of receiving affidavits after the judgment *nisi* to show the amount in dispute in these equity cases, where no money judgment is sought, the damage to this defendant by virtue of this decree, written up from the petition, rather than from the evidence touching the particular plant involved in this particular case, would be appalling. Plaintiff sued without bond, and after the decree *nisi*, it was modified so as to allow the completion of those walls to *protect the machinery,* evidently installed therein. The cooling system and its machinery had to be built in as the walls were built. But this is not all, there was a *supersedeas* granted, thus giving to defendant the full legal right to complete, in full, the plant, and even to operate it, until this court spoke to the contrary. As yet it has not so spoken. This court has jurisdiction beyond a question of a doubt, and the Commissioner is amply sustained on the merits of the case. The motion for rehearing should be overruled. *Blair, Atwood* and *Gantt, JJ.,* concur; *White, J.,* concurs in all except what is said about the constitutional question; *Walker, C. J.,* and *Ragland, J.,* dissent.