Ralph E. **LEE** et al., Plaintiffs-Appellants,

v.

**ROLLA SPEEDWAY, INCORPORATED,** a corporation, and **Central Missouri Regional Fair, Incorporated,** a corporation, Defendants-Respondents.

**No. 56177.**

Supreme Court of Missouri, Division No. 1.

May 14, 1973.

Melvin E. Carnahan, Rolla, for plaintiffs-appellants.

Routh & Turley, Dewey Routh, Rolla, for defendants-respondents.

WELBORN, Commissioner.

Action by persons living in vicinity of proposed automobile race track to enjoin construction, maintenance and operation of such facility. Trial court denied injunction. Evidence showed that at time of trial $60,000 had been expended or obligated by owner of track on its construction. Therefore, appeal, prior to January 1, 1972, was taken to this court. Section 477.040, RSMo 1971 Cum.Supp.

In 1949, a predecessor organization of the Central Missouri Regional Fair, Inc., a not-for-profit corporation, acquired a tract of land of something less than 80 acres south of the Rolla city limits, and lying along the east boundary of U. S. Route 63. Although details of the Fair operation do not appear, the evidence did indicate that beginning shortly after 1949, an annual Fair of three to five days' duration was held on the premises. Occasional horse shows were also held there. One or two circuses had been held on the fairgrounds in some six years prior to the trial of this case.

On October 31, 1969, the Fair corporation entered into a lease which was assigned to Rolla Speedway, Incorporated. The lessee obligated itself to construct and maintain a ⅜-mile automobile speedway track on the fairgrounds. The lease was for a term of ten years, with option for two five-year renewals. At the expiration of the lease, improvements became the property of the lessor. The lessor was to receive $50 "for each day that the Fairgrounds are used."

By May 5, 1969, Speedway had spent some $20,000 for clearing and grading work at the proposed site of the track.

On May 5, 1969, Mr. Melvin Carnahan, as attorney for 45 residents in the vicinity of the fairgrounds, addressed a letter to the Fair and the Speedway corporations, demanding that construction of the race track stop for the reason that the use of the tract for an automobile speedway would constitute a nuisance.

The letter produced no results and on July 11, 1969, a petition was filed in the

circuit court by residents in the vicinity of the project. The transcript does not disclose the number of plaintiffs joining in the petition. The petition did allege that the plaintiffs resided at distances of from 200 feet to ⅜ of a mile of the proposed track. It further alleged:

"7. That the construction and operation of said racetrack will render the property of these plaintiffs practically valueless as residences; that the operation of a racetrack at said point will create an immense amount of noise, dust, dirt, fumes and light, which will penetrate into the homes of these plaintiffs, thereby rendering them unfit as homes for plaintiffs to live in, and that the great noise that will be created by the operation of said racetrack will be a great damage to them, because it will render their homes undesirable and unfit as places of residence, particularly when it occurs at night during normal hours of repose; and that the maintenance and operation of said racetrack will necessarily cause these plaintiffs to close up their said homes, all of the windows and doors, in order to prevent the noise, dust, dirt, fumes and light therefrom from coming into their homes in great quantities; and that it will be impossible for these plaintiffs or their families to use their yards, or, in fact, to live comfortably in said homes during the operation of said racetrack."

By interrogatories answered by Mr. M. C. Miller, president of Speedway, and by the trial testimony of Miller, who was called as a witness by plaintiffs, the proposed operation was along the following lines:

An oval racecourse was planned which would have a blacktop surface. The racing surface would be 48 feet wide and its outer perimeter about 120 feet short of a half-mile in length. A grandstand with a seating capacity of 5,000 persons was planned. The track would be lighted by 84 1500-watt lights on 14 poles surrounding the inner oval of the track and 16 1500-watt lights on 4 poles around the outer perimeter.

The outer perimeter of the track is to be surrounded by a 4-foot concrete wall. The curves at each end of the track will be banked at 30° grade, and the straightaway at 12°.

Racing would be held between 7:30 and 10:30 P.M. on Saturdays, beginning in May and ending in September. The automobiles involved would be late model stock cars. At least 25 vehicles are required "to put on any kind of show in any kind of race." A typical program would involve 4 heat races of 10 laps each, a 20-lap feature, and a trophy dash.

In answer to an interrogatory, Miller stated: "Noise will be created by the automobiles participating in the races." At the trial he stated that the cars would not run with mufflers. "You couldn't run a muffler on a race car. * * * The louder you can make it the better the spectators like it." He stated: "The boys, they make the car—they are going to make them as loud as they possibly can." "I would say total noise, there won't be an hour and a half of noise one night a week." "* * * [T]his isn't going to be as noisy as these people think it's going to be * * *."

Miller testified that spectators' autos will be parked on grass covered lots, with the access roads either blacktopped or graveled and oiled. Space would be provided for parking between 2500 and 3500 automobiles.

At the time of the trial in June, 1970, the site had been cleared and graded. The track had been shaped in and the concrete retaining wall built around its outer perimeter and drainage pipes had been laid in the infield.

Plaintiffs' evidence showed that within a half-mile radius of the grandstand of the track there were 74 housing units in which 256 persons lived. Enlarging the radius to ¾ mile added 43 units and 126 persons, to 1 mile, 52 units and 190 persons, and to 1¼ miles, 77 units and 96 persons, making a total of 246 housing units and 768 residents within a 1¼ mile radius. The Primitive

Baptist Church was 820 feet from the track and the Calvary Assembly of God Church 1880 feet from the track.

Seven residents testified on behalf of plaintiffs. They owned and lived in houses situated from 220 feet to 1400 feet from the track. The houses were valued at from $15,000 to $27,000. At least five were not air-conditioned. The occupants of those five relied upon natural ventilation in summer. All of the witnesses testified that they spent quite a bit of time outdoors at their homes, gardening, barbecuing and doing yard work. All expressed concern that the noise which would be caused by the races would disturb and interfere with their enjoyment of their homes, particularly insofar as outdoor activities were concerned. They also feared that the additional traffic and resulting dust would be a problem.

Two of the witnesses testified that they could hear the noise caused by the operation of the Char Leah race track, some four miles away. Witnesses also acknowledged that traffic on Highway 63 involved noise and that when fairs were held on the grounds the noise caused by loud speakers and other activities was heard by surrounding residents.

A member of the Primitive Baptist Church testified that once a year the church held an association meeting in the summer on Friday, Saturday and Sunday. They also had services on Saturday night when they had a visiting pastor. Three or four such meetings would be held in the evening from spring to fall. He stated that the Fair loud speakers interfered with such meetings and that he believed the race track operation would be objectionable to the church and its activities.

A witness who lived 650 feet from the Char Leah track testified that races are held there from 7:00 to 10:00 or 10:30 P. M. on Sundays. During the week he sits outside in his yard in the evening, but while the races are going on, "we have to go in the house, because you cannot hear a thing. * * * [You] go inside, close the windows, turn on the T.V. and air-conditioner and stay in there. * * * [W]ith the windows closed you can hear the loudspeaker. The—as far as the race is concerned, it's just more or less of a drone, like a beehive out there."

Dr. William S. Gatley, Associate Professor of Mechanical Engineering at the University of Missouri at Rolla testified for plaintiffs. Doctor Gatley has a Ph.D. degree from Purdue University in mechanical engineering, with specialization in acoustics, which he described as the study of the means by which sound is produced by various devices, how it is measured, how it is transmitted from one point to another, how it is controlled, and its effects upon people and animals subjected to it.

He stated that sound or noise may be scientifically measured and that the normal unit for measurement is the decibel. The device for measuring sound is known as a sound level meter. This device has built into it a means of excluding lower frequencies of sound, much as does the human ear. The product of such measurement is known as decibels on the A scale. According to the witness, standards had been arrived at for the maximum acceptable decibel values in quiet residential areas, including a basic noise level, frequent peaks, and infrequent peaks, and nighttime and daytime. He stated that such standards, measured by decibels on the A scale are as follows:

| " | Basic Noise Level | Frequent Peaks | Infrequent Peaks |
|---|---|---|---|
| Night | 45 | 55 | 65 |
| Day | 55 | 65 | 70" |

According to the witness, the limits of acceptability are based upon what a significant majority of the people regard as acceptable or not.

Doctor Gatley stated that standards for community reaction to noise (NR) had been suggested, ranging from no observed reaction to a reading of less than 40 to

"vigorous community action" at a reading above 65.

Another standard is the Speech Interference Level (SIL) which measures the effect of sound level upon ability to have reliable conversation at various distances and voice levels. Criteria for this measurement are:

| "distance (feet) | normal | raised | voice level very loud | shouting |
|---|---|---|---|---|
| 1 | 70 | 76 | 82 | 88 |
| 3 | 60 | 66 | 72 | 78 |
| 6 | 54 | 60 | 66 | 72 |
| 12 | 48 | 54 | 60 | 66" |

Doctor Gatley conducted a noise survey at the Char Leah race track near Rolla on Sunday, May 18, 1969, between 8:00 and 9:45 P.M., while a racing program was in progress. He set up a sound level meter approximately 825 feet from the track and observed the following results on the basis of the standards previously mentioned with respect to the sound level in various situations which occurred that evening:

| "Type of Sound | SPL (linear) | SPL (A‑Weighted) | NR | SIL |
|---|---|---|---|---|
| Time trial (single car) | 75–80 * | | 70 | 62 |
| Trophy race | 75–82 * | 76–80 * | 75 | 72 |
| Novelty race (9 cars) | 80 (max) | 73 (max) | 70 | 66 |
| Feature (11 cars) | 80–84 * | 72–77 * | 75 | 71 |
| General background (loudspeaker and engine noise) | 72 (max) | 58 (max) | 55 | 49 |
| Background (Dickman Airport) (no noise from track‑traffic noise from 144) | 52 (avg) 48 (min) | 42 (avg) 36 (min) | | |

*    *    *    *    *

* range of values during acceleration"

Doctor Gatley went from the Dickman Airport where he had measured the sound level at the Char Leah raceway to a road on the east side of the fairgrounds, a short distance from the site of the proposed raceway there, and some 600 feet east of Highway 63, and observed a sound pressure level of 38 to 44 decibels. A maximum level of 53 was caused by a noisy truck on Route 63. The readings on the A scale were from 26 to 38, with the maximum of 46 from the noisy truck. Doctor Gatley described these results as indicative of "a very quiet residential area." He was of the opinion that noise levels such as he had measured at Char Leah would, if produced in the fairground area, result in a 30 to 40 decibel increase in sound level during race activity.

Doctor Gatley testified that he had noted the difference between the construction of the fairground course and Char Leah. He stated that the fairground course is banked to a much greater extent and is "dished out" so that a good part of the track is actually below grade. Insofar as noise traveling from the track was concerned, he stated that the most significant feature of the fairground track was the 4-foot concrete barrier. He stated that this wall might result in a reduction in sound level of from 5 to 10 decibels for a person up to within 50 feet of it, but that the farther away one moved from the wall, the less the effect of the wall would be, so that at a distance of 300 to 400 feet the difference in sound level which the barrier would cause would be "almost unmeasurable."

The defendants offered evidence that there was no zoning regulation applicable to the fairground area. One person who lived 500 to 600 feet from the track testified that he had no objection to it. He had built his house and four others in the area. He sold three of them in 1969 and did not have to sell them "at a depreciated value."

The essential finding of the trial court is reflected in the following paragraph from its Findings and Judgment:

"Plaintiffs' bill or petition fails to state allegations of facts that would support injunctive relief. The evidence, including all exhibits (except defendants' exhibit F) admitted and considered in disposing of this case, and including the expert witness for plaintiffs and his recording by tape of

noise created in another race track operation, fails to carry the burden necessary to support injunctive relief."

This conclusion was premised largely upon the rule as to the burden of proof upon the plaintiff in a case such as this which the court deduced from the opinion in Aufderheide, et al. v. Polar Wave Ice & Fuel Co., 319 Mo. 337, 4 S.W.2d 776 (Banc, 1928). The trial court's findings include frequent quotations from the opinion in that case. That case involved an action to enjoin construction of an ice plant on the grounds that its operation would be a nuisance insofar as neighboring residential property was concerned. The trial court granted injunctive relief, but on appeal the decree was reversed. In its opinion the court speaks of the burden upon the plaintiff in such a case as being to establish his right to relief "clearly and conclusively," and to show that the injury will be "inevitable and undoubted." 4 S. W.2d 785–786[6, 7].

As was pointed out in Clutter, et al. v. Blankenship, et al., 346 Mo. 961, 144 S.W. 2d 119, 122[12, 13] (1940), the rule applied in Aufderheide governs cases "where the contemplated act of the defendant may or may not constitute a nuisance depending on the manner in which it is done." In Aufderheide, the plaintiffs relied upon evidence of operation of other ice plants which tended to show the production of annoying volume and quantity of noise, dust, odors and sprays. The evidence by the defendant sharply contradicted that of the plaintiffs, resulting in the view of the appellate court that the evidence "was evenly balanced and preponderated in favor of neither of the opposite parties to this action." 4 S.W.2d 780.

On this appeal here, the appellants limit the basis of their claim for relief to the disturbance which the noise produced by the operation of the race track would cause. That there would be noise was not disputed. The president of the track acknowledged as much. He also stated that it would not be possible to operate with muffled vehicles, so there is no question here of alternative methods of operation, one of which would give rise to the objectionable features complained of and one of which would avoid them. In fact, from the testimony of Mr. Miller, it can be concluded that noise is an essential portion of the amusement which the track would provide—essential to participants and spectators alike.

■ In these circumstances, rather than the strict, onerous burden stated in Aufderheide and applied by the trial court to plaintiffs' evidence, the matter should have been considered in the light of whether or not the evidence demonstrated a reasonable likelihood that the operation of the track would produce such invasion of the rights of neighboring landowners as would call for the granting of injunctive relief. City of Spickardsville v. Terry, 274 S.W.2d 21, 26[5, 6] (Mo.App.1954); Mason v. Deitering, 132 Mo.App. 26, 111 S.W. 862, 865 (1908).

The plaintiffs' evidence did show that the operation of the proposed raceway would interfere with the plaintiffs' use and enjoyment of their property. The experience of the resident near the Char Leah track and the scientific measuring of the noise there produced showed with reasonable certainty that the noise which the racing at the proposed track would produce would interfere with the plaintiffs' use of their property for residential purposes. The noise would effectively prevent enjoyment of outdoor areas of their property by plaintiffs during the time that racing was going on. Conversation would be impossible so that the frequent social gatherings on the night traditionally reserved for such purpose could not be held. The racing would also be held at the seasons of the year when outdoor activities are at the height.

The trial court apparently discounted the Char Leah evidence on the grounds that the operation at the proposed track would

be different. Mr. Miller did testify that the proposed track would involve late model stock cars whereas Char Leah involved older model cars. However, there was no claim that such difference would result in the production of less noise at the new track. Miller acknowledged that both late model autos and "junkers" made a lot of racket and that both operate without mufflers. Mr. Miller had no scientific basis for his claim that the retaining wall atop the track would cause the sound to rise, rather than extend outward. Plaintiffs' evidence showed that there was no scientific basis for such reasoning.

■■ However, interference with the use and enjoyment of their property is not the only question to be decided in determining whether or not plaintiffs are entitled to relief. That determination requires the weighing of the "utility of the actor's conduct" against "the gravity of the harm." 4 Rest. of Torts, § 826, p. 241; Fuchs v. Curran Carbonizing and Engineering Co., 279 S.W.2d 211 (Mo.App.1955). Compare: Township of Bedminster v. Vargo Dragway, Inc., 434 Pa. 100, 253 A.2d 659 (1969) and Lee v. Bowles, 397 S.W.2d 923 (Tex. Civ.App.1965). See Annotation: Automobile Racetrack or Drag Strip as Nuisance, 41 A.L.R.3d 1273 (1972).

According to the Restatement (§ 827, p. 244) the following factors are important in measuring the gravity of the harm: "(a) the extent of the harm involved; (b) the character of the harm involved; (c) the social value which the law attaches to the type of use or enjoyment invaded; (d) the suitability of the particular use or enjoyment invaded to the character of the locality; (e) the burden on the person harmed of avoiding the harm."

Insofar as the utility of the conduct is concerned, the following factors are signif-

icant (§ 828, p. 250): "(a) social value which the law attaches to the primary purpose of the conduct; (b) suitability of the conduct to the character of the locality; (c) impracticability of preventing or avoiding the invasion."

■■ On this equity appeal, this court would ordinarily examine the evidence and make its own findings and conclusions on these issues. This case, however, presents an unusual situation. According to the statements of counsel at the oral argument, the race track has now been completed and has been in operation. In such circumstances, there is no necessity to adjudge "the extent of the harm involved" on a theoretical basis. Evidence should now be available as to the actual effect of the track operation and the rights of the parties can much better be adjudged on that basis. Appellants have requested, alternatively, that this court remand the cause to permit evidence to be presented on the actual operation. Having concluded that the improper standard applied by the trial court as to the burden of proof imposed upon the plaintiffs on the trial resulted in the erroneous conclusion that plaintiffs had failed to carry their burden, the trial court's decree is required to be set aside and, in the circumstances, the alternative relief sought by appellants is particularly appropriate.

Decree reversed and cause remanded for further proceedings.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.