**Ralph E. LEE, et al., Respondents,**

v.

**ROLLA SPEEDWAY, INCORPORATED;**
**and Central Missouri Regional Fair,**
**Inc., Appellant.**

No. 13113.

Missouri Court of Appeals,
Southern District,
Division One.

March 12, 1984.

Martin Mazzei, Woodward, Rohrer & Mazzei, P.C., Steelville, for appellant.

Van A. Miller, Waynesville, for respondents.

CROW, Judge.

This is the third chapter in a dispute about whether there shall be automobile racing on the grounds of Central Missouri Regional Fair, Inc. ("Fair"), a not-for-profit corporation, in Phelps County. The first was *Lee v. Rolla Speedway, Inc.*, 494 S.W.2d 349 (Mo.1973), hereafter "*Lee-1*"; the second, *Lee v. Rolla Speedway, Inc.*, 539 S.W.2d 627 (Mo.App.1976), hereafter "*Lee-2.*" Those opinions chronicle the history of the quarrel, and we borrow only such details as are necessary to introduce the instant appeal.

In 1949, a predecessor organization of Fair acquired land along the east boundary of highway 63, south of Rolla. In ensuing years, an annual fair of three to five days' duration was held there, along with occasional horse shows and one or two circuses.

In 1968, Fair leased some 20 acres of its property to Rolla Speedway, Incorporated ("Speedway"). The lease obligated Speedway—at its expense—to construct an automobile racetrack on the leased parcel. The lease was for 10 years, with options for two 5-year renewals. When the lease expired, the improvements were to become Fair's property. Speedway was to pay Fair $50 "for each day that the Fairgrounds are used."

In early May, 1969, after Speedway had spent some $20,000 clearing and grading the track site, 45 residents in the vicinity of the project, acting through counsel, implored Fair and Speedway to cease construction for the reason that automobile races at that location would constitute a nuisance. When their entreaties proved unavailing, 21 of the residents filed suit for an injunction against Speedway and Fair.

The cause was court-tried, and judgment was entered denying relief. That judgment was reversed in *Lee-1*, the Supreme Court holding that the trial court had applied too strict a standard of proof to the plaintiffs' evidence. According to the Supreme Court, the trial court had ruled that the burden was upon the plaintiffs to establish their right to relief clearly and conclusively, and to show that the injury they feared from the racetrack would be inevitable and undoubted. *Lee-1*, 494 S.W.2d at 354. Noting that Speedway had conceded there would be noise from the track, and it would not be possible to operate the racing vehicles with mufflers, the Supreme Court held the trial court should have considered the plaintiffs' evidence in the light of whether it demonstrated a reasonable likelihood that the operation of the track would produce such invasion of the plaintiffs' rights as would call for the granting of injunctive relief. *Id.* at 354[1]. The Supreme Court recognized that inasmuch as the track had been completed and racing had begun while the appeal was pending, evidence would be available on remand as to the actual effect of the track operation, and the rights of the parties could better be adjudged on that basis. *Id.* at 355[3, 4].

After remand, a second trial was held before a different judge, and judgment was entered permanently enjoining Fair and Speedway from operating an automobile racetrack on Fair's land. Speedway, but

not Fair, appealed. That judgment was affirmed in *Lee-2*.

A little over three years after the mandate in *Lee-2*, Fair filed a motion to modify the injunction, alleging that Speedway's lease had been terminated by a 1978 judgment in a suit between Fair and Speedway, and that Fair had sole possession of the parcel where the racetrack lay, including the grandstand, bleachers, fences, lighting and other facilities. Fair added that certain specified "changes and improvements" it proposed to make at the track would "substantially remove the dangers of further nuisance," and that "any remaining dangers would become attenuated to a shadow." Fair prayed that the decree be modified to permit automobile racing under Fair's supervision and control, subject to the changes and improvements it proposed to make, and to such other restrictions as the court deemed proper.

When Fair filed its motion to modify, some of the persons who had been plaintiffs at the first trial were apparently no longer residing near the track, and the whereabouts of some were unknown. Other original plaintiffs still lived near the track, and they actively opposed Fair's motion to modify. Speedway, having no interest in the outcome, filed no pleadings.

A new judge was assigned to the case, and a third trial was held. Fair stipulated that the original plaintiffs who remained opposed to automobile racing at the track, together with other persons of like sentiment who appeared at the third trial, constituted a "representative class" of the neighborhood around the track. Fair presented evidence in support of its motion to modify, and those who opposed it (hereafter "respondents") presented evidence in opposition.

The trial court, in an order accompanied by findings of fact and conclusions of law, denied Fair's motion, leaving the injunction intact. This appeal followed.

We approach Fair's appeal by noting that the existing injunction is based on the evidence at the second trial. That trial occurred in December, 1974. At that time,

automobile racing had been conducted at the track for four consecutive racing seasons. *Lee-2*, 539 S.W.2d at 629, n. 1.

We learn from *Lee-2* that there was substantial evidence at the second trial to support a finding that the noise generated at the track during automobile racing carried into the neighboring residential areas at intolerably high levels. The noise, measured scientifically by William S. Gatley, a professor of mechanical engineering and an expert in noise control, acoustics and vibrations, consisted of engine noise, the screeching of tires, the track's loudspeaker system and the "general hullabaloo of the racing fans." *Id.* at 631. Speedway presented evidence at the second trial that the races could be conducted more quietly by restricting the size of the vehicles and requiring them to be equipped with mufflers; however, the trial court was evidently unconvinced.

Moreover, there was substantial evidence at the second trial to support a finding that unbearable noise was not the only element of nuisance caused by the races. Dust and offensive odors or fumes created by the racing automobiles, and the glare from the floodlights at the track, invaded nearby homes, to the annoyance of the occupants.

We cannot determine from *Lee-2* the number of homes in the vicinity of the track at the time of the second trial; however, we find in *Lee-1* that at the time of the first trial there were 74 housing units within a half-mile radius of the grandstand. 256 persons lived in those units. Enlarging the radius to ¾ mile added 43 units and 126 persons, to 1 mile, 52 units and 190 persons, and to 1¼ miles, 77 units and 96 persons. Additionally, there was a church 820 feet from the track and another church 1,880 feet away. *Lee-1*, 494 S.W.2d at 351–52.

There was no evidence at the third trial as to the precise number of housing units or occupants within those radii; however, there was substantial evidence that the total number of residences in the immediate vicinity of the track had increased since the

injunction was entered, and the trial court so found.

Fair's evidence at the third trial indicated that if permitted to conduct automobile racing at the track, Fair would make improvements and impose restrictions designed to abate the nuisance established by the evidence at the second trial. Fair proposed to (a) use a 300-watt loudspeaker system instead of the 900-watt system formerly used, (b) turn the speakers to a downward position "so they wouldn't blare out," (c) provide six parking and traffic attendants, (d) ask the sheriff and the Missouri State Highway Patrol to help with traffic before and after the races, if needed, (e) oil or blacktop the roads around the grounds, (f) sell advertising on plywood boards, to be mounted on the chain link fence atop the 4-foot high concrete wall surrounding the track, thereby creating a sound barrier, (g) lower the floodlights to a "more downward position," to prevent them from shining into the windows of nearby houses, (h) try to "keep all the loud and arguments and things like that all under control," (i) require all racing vehicles to run with mufflers, (j) prohibit a vehicle from racing if its engine noise exceeded a certain decibel level, (k) restrict racing to weekends and holidays, (l) turn the track lights off no later than 10:30 p.m., (m) start no race earlier than noon, (n) schedule no more than 12 racing dates a year, (o) ban "hot laps" and the testing of racing vehicles at the track on weekdays, (p) establish "emission standards" to control odor and fumes from racing vehicles, and (q) prohibit loud radios and stereos in the parking area.

Before the third trial, Fair retained Joseph McBryan, an "acoustical engineer," to measure (1) the noise reduction achieved by installing a muffler on a racing vehicle, and (2) the noise produced by a racing vehicle running at racing speed on Fair's track. McBryan conducted tests to obtain that data on June 5, 1982, aided by two race drivers and their vehicles.

McBryan set his sound-measuring equipment 544 feet from the outer edge of the track. One of the vehicles, carrying no noise abatement equipment and running at an average speed of 82 miles per hour on the track, produced a reading of 64 decibels.[1] The same vehicle, equipped with a "collector pipe," produced a reading of 60 decibels. Equipped with a muffler and a collector pipe, the vehicle produced a reading of 58 decibels. The other vehicle, equipped with a collector pipe and muffler, produced a reading of 58.6 decibels.

McBryan opined that 10 racing vehicles similar to those in the test, equipped with mufflers and collector pipes and running simultaneously on the track, would produce a reading of 68 decibels at the same distance (544 feet). McBryan believed that two persons one meter apart could communicate at normal voice levels 680 feet from the track during a 10-vehicle race. He conceded on cross-examination that he did not measure noise from other sources at the track, such as the spectators, the loudspeaker system, collisions between vehicles, or squealing tires. He added, however, that noise from those sources would not increase the sound level by more than three decibels.

There was evidence that speeds of 102 miles per hour had been attained in races at Fair's track. McBryan had no opinion whether the decibel level from the vehicles in his test would be higher at that speed.

The largest attendance at a racing program during the four years the track operated was 8,000. Other than that, attendance ranged from 1,000 to 6,000.

Fair's evidence at the third trial also included testimony from five persons who reside near the track at distances ranging from 1,000 feet to a half mile. They testified they do not object to automobile racing at the track under the conditions proposed by Fair. Another witness testified he

---

**1.** The reading in decibels was "weighted" to simulate the hearing of a normal person. McBryan referred to this as "A-weighting." The same unit of measurement appears in evidence regarding sound levels at the first trial (*Lee-1,* 494 S.W.2d at 352–53), and the second trial (*Lee-2,* 539 S.W.2d at 630–31).

plans to build a residence for himself on land he owns near the track, and has no objection to automobile racing at the track.

Additionally, Fair's president testified the track cannot be used for anything except automobile racing. Although paved with asphalt, the track is unusable as a parking area because of the degree to which it is banked. An officer of the company that did the grading and earth-moving to construct the track testified it would cost $32,500 to remove the track and restore the site to substantially the condition it was before the track was there.

Respondents presented testimony at the third trial from nine persons who reside at various distances between 100 yards and 2,000 feet from the track. All objected to the resumption of automobile racing, with or without the conditions proposed by Fair. Two testified they would not have purchased their homes had there been automobile racing at Fair's track when they bought. Another testified he would sell his home if racing resumed. Their complaints, in addition to those already noted, included traffic congestion before and after races, litter, dust stirred up on the unpaved roads near the track by spectators' automobiles, deflation of property values, and the disruptive effect of the noise on sleep and outdoor entertaining. One of the witnesses, a realtor, testified the percentage of residential sales in the area around the track declined after it became known that Fair was seeking permission to reopen the track for automobile racing. Another testified she had canvassed approximately 150 people residing within 3,000 feet of the track, and that 60 to 75 per cent did not want the track reopened for automobile racing.

William Gatley, who had testified as an expert on noise control and acoustics at the first and second trials, appeared as a witness for respondents at the third trial. He testified the criterion for determining the effect of noise on speech communication between two persons should be a distance of three meters between them, rather than the one meter used by McBryan. Gatley agreed with McBryan that the engine noise of a racing automobile could be reduced six decibels by noise-abatement equipment, but Gatley disagreed with McBryan's conclusion that two persons 680 feet from the track could carry on a normal conversation during a race. Gatley, using his criterion of a three-meter distance between two people, opined that voice communication at normal levels would not be possible within 3,000 feet of the track during a 20-vehicle race.[2]

Fair relies on two points. The first is that there is now "responsible ownership" of the track, and that by reason of "significant advances in muffler technology" the track can be operated on a "limited basis" without nuisance to respondents. Fair argues that since the second trial, automobile racing has evolved from "the process of backyard mechanics' creations, noisily racing about the track to the delight of raucous, unmanageable racing fans" into a highly sophisticated sport. Fair bases this assertion on the testimony of a builder of racing automobiles, who explained that such vehicles had become "very sophisticated." They are lower and sleeker, and the spectators can identify the vehicles with what they drive on the street. According to the witness, the majority of racing vehicles are equipped with mufflers, which have a "very negligible" effect on horsepower but a definite effect on engine noise.

A racing driver testified that a muffler does not hinder the performance of his vehicle, but does make it run more quietly. Another racing driver testified the use of mufflers on racing vehicles had become more widespread than it was during the years racing was conducted at Fair's track.

■ Fair correctly observes that a permanent injunction based on a condition subject to change may be vacated or modified in order to avoid unjust or absurd results

---

**2.** The track is approximately a half mile in circumference. Gatley testified without contradiction that 20 vehicles are a representative number for a race, being fewer than the maximum and more than the minimum.

when a change occurs in the factual setting or the law which gave rise to its existence. *Twedell v. Town of Normandy*, 581 S.W.2d 438, 440[1] (Mo.App.1979). Fair contends, in esse, that the automobile racing it wants to conduct is of a different character than that of 1971–74, therefore it would be unjust and absurd to continue to prohibit automobile racing at its track, particularly in light of the changes and improvements to which Fair has committed itself. Implicit in Fair's argument is the assumption that those reforms would abate the nuisance inherent in past races.

Unfortunately for Fair, the trial court disagreed with that assumption. Though convinced that Fair's officers are responsible citizens interested in the affairs of the community and surrounding area, the trial court found "that the changes suggested by [Fair] are those of style, and were available for the Court's consideration in 1975."[3] Observing that (a) the number of residences in the immediate vicinity of the track had increased since the second trial, (b) church services are regularly held in the area, and (c) one church had undergone extensive improvement, the trial court concluded that the few demonstrated changes tended to favor respondents. In reaching its decision, the trial court commented: "[Fair] offered a considerable amount of proof concerning their intentions should the injunction be altered. Unfortunately, this does not meet [Fair's] burden in this case."

▮▮▮ As observed in *Lee-2*, in our review of a court-tried case, the judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. 539 S.W.2d at 629[2]; *Murphy v.*

*Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). In determining whether the evidence is sufficient to support the judgment, we are obliged to accept as true the evidence and permissible inferences which may be drawn therefrom favorable to the prevailing party, and to disregard the contradictory testimony. *Cusumano v. Outdoors Today, Inc.*, 608 S.W.2d 136, 139[5] (Mo.App.1980); *S.G. Adams Printing & Stationery Co. v. Central Hardware Co.*, 572 S.W.2d 625, 628 (Mo.App.1978).

▮▮▮ So viewed, we find the evidence sufficient to support the trial court's determination that the changes attributed by Fair to automobile racing between the second and third trials,[4] and the improvements Fair proposed to make, would not reduce the noise, fumes, dust, glare, traffic congestion and other annoyances to a degree sufficient to abate the nuisance.

True, Fair's reforms, if carried out, would mean fewer racing dates, shorter programs, later starts, earlier finishes and no "hot laps" or car testing on weekdays. Noise, fumes, dust, glare and traffic congestion would likely be tempered, in varying degree. Lessening a nuisance, however, is not the equivalent of abating it. Bearing in mind that the burden of proof was on Fair, we cannot say the trial court erred in concluding that even with the changes and improvements proposed by Fair, automobile racing at Fair's track would remain a nuisance to those residing in the vicinity.

Using the data compiled by McBryan and the speech interference levels set out in *Lee-2*,[5] two persons 544 feet from the track would have to be within three feet of each other to communicate at normal voice levels when one racing vehicle with noise abatement equipment was running on the track at an average speed of 82 miles per hour, and within one foot of each other to

---

**3.** The second trial, as already noted, was in December, 1974. After hearing the evidence, the trial court granted the parties time to file briefs, thereby delaying entry of the judgment until March 11, 1975.

**4.** The third trial was held in October, 1982. ▮▮▮

**5.** 539 S.W.2d at 630. Gatley testified at the third trial that the speech interference levels in evidence at the second trial had been superseded by "preferred speech interference levels" based on a different set of octave bands. According to Gatley, the new levels changed the former ones "slightly"; however, he did not explain where the changes lay, or their extent.

communicate at normal voice levels during a 10-vehicle race.

Moreover, Gatley, using McBryan's data, testified at the third trial that two persons three meters apart could not communicate with each other at normal voice levels during a 20-vehicle race if they were within 3,000 feet of the track. In expressing that opinion, Gatley assumed all the vehicles were muffler-equipped. When we note that 256 persons resided closer than 3,000 feet to the track at the time of the first trial, and that the number of residences in the immediate vicinity of the track increased since the second trial, we cannot say the judgment is unsupported by substantial evidence or against the weight of the evidence. We therefore reject Fair's contention that the trial court erred in holding that automobile racing at Fair's track, even if conducted under the proposed changes and improvements, would continue to constitute a nuisance.

Fair's second point is that inasmuch as automobile racing at its track can be conducted on a limited basis in a manner that will not constitute a nuisance to respondents, the trial court erred in denying Fair this "lawful and inoffensive use" of its property.

In arguing this point, Fair's able and industrious counsel reminds us that the power to abate a nuisance does not carry with it the power to absolutely prohibit conduct that is lawful and unconnected with the nuisance, *State ex rel. Wallach v. Oehler*, 159 S.W.2d 313, 316[7] (Mo.App. 1942), and that in abating a nuisance, the relief should not exceed what is necessary to achieve that end, *Hunt v. Easley*, 495 S.W.2d 703 (Mo.App.1973).

Relying on *Massey v. Long*, 608 S.W.2d 547 (Mo.App.1980), Fair says the trial court should have balanced the equities of the parties and formulated an order which, while giving respondents relief from the nuisance, would have protected Fair's right to conduct automobile racing on its grounds.

The frailty of Fair's second point is the same as its first. It assumes the changes and improvements planned by Fair

would abate the nuisance, an assumption the trial court rejected. Even if there were sufficient evidence to support such an assumption—a point we need not decide—the trial court was not required to believe such evidence. The trial court, as trier of the facts, had leave to believe none, part or all of the testimony of any witness. *Lohrmann v. Carter*, 657 S.W.2d 372, 377 (Mo. App.1983); *Husky Industries, Inc. v. Craig Industries, Inc.*, 618 S.W.2d 458, 460 (Mo.App.1981). Having already ruled the evidence sufficient to support the trial court's finding that the changes and improvements suggested by Fair would not abate the nuisance, we find Fair's second point without merit.

We are not oblivious of Fair's frustration at being denied the use of its track for automobile racing. That, however, affords no basis for reversal where, as here, the judgment is supported by substantial evidence, is not against the weight of the evidence, and no error of law appears.

Judgment affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.